ELGIN, JOLIET AND EASTERN RAIL-
WAY COMPANY, a corporation,
Plaintiff,

v.

BENJ. HARRIS & CO., a corporation,
Defendant.

No. 63 C 1009.

United States District Court
N. D. Illinois, E. D.

Aug. 26, 1965.

Jay A. Lipe, W. Gerald Thursby, Stevenson, Conaghan, Hackbert, Rooks & Pitts, Chicago, Ill., for plaintiff.

Ben Liss and Michael M. Lyons, Sonnenschein, Levinson, Cartin, Nath & Rosenthal, Chicago, Ill., for defendant.

WILL, District Judge.

Plaintiff, Elgin, Joliet and Eastern Railway Company (hereinafter EJ&E), instituted this action to recover $2,668.89 in additional freight charges alleged to be due from the defendant. The instant controversy involves a shipment of used gunsights shipped from Pocatello, Idaho to Chicago Heights, Illinois at the scrap metal rate of $1.05 per cwt. EJ&E contends that the general commodity tariff ($4.61 per cwt.) applies to this shipment and, since it is statutorily obligated to charge and collect the applicable rate, Interstate Commerce Act, Part I, § 6(7), 49 U.S.C. § 6(7), the additional freight charges are due from the defendant.

The sole issue in this proceeding is the applicability of one of two alternative rates to the shipment. The reasonableness of the rates is not questioned. Defendant does not assert any set-off, counterclaim or other defense collateral to the applicability question.

I

The question of tariff construction here presented is similar to that involved in United States v. Western Pacific Railroad Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). It is, therefore, within the exclusive primary jurisdiction of the Interstate Commerce Commission. Accordingly, this court directed EJ&E to institute appropriate proceedings before the Commission, retaining jurisdiction of the action pending the ICC decision.

Pursuant to the court's order, EJ&E filed, in October, 1964, a petition for a declaratory order under § 5(d) of the Administrative Procedure Act, 5 U.S.C. § 1004(d). On February 4, 1965, the ICC Examiner filed his report and recommended order finding that the general commodity tariff applied to the shipment

in question; that the shipment was incorrectly billed at the scrap metal rate; and that EJ&E was obligated to collect the additional amount from defendant Harris. No exceptions were filed and, on March 16, 1965, the Commission served notice that the examiner's report and recommended order had automatically been adopted as the order of the ICC.

■■ While characterized as a "declaratory" order, there is no question that the ICC order was itself subject to direct judicial review. See National Van Lines v. United States, 326 F.2d 362 (7 Cir. 1964). Indeed, in view of the 1964 amendments to 28 U.S.C. §§ 1336 and 1398 and the principle stated in Eastern Freight-Ways, Inc. v. United States, 170 F.Supp. 848, 850 (D.N.J.1959), any direct review of the ICC order would have taken place in this court rather than before a three-judge panel. While the scope of review would of course be limited in accordance with § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 1009(e), the underlying issues would have been identical to those presented in the complaint originally filed here by EJ&E, although, pursuant to 28 U.S.C. § 2322, the United States would be denominated as the party defendant. No such proceedings for direct review were instituted within the period specified by statute, 28 U.S.C. § 1336(c). Accordingly, the ICC's order accepting the report and recommendation of its examiner has become final.

Under these circumstances, EJ&E seeks summary judgment on its complaint, asserting that the ICC order is final and binding on all parties and that no issues remain before the court for decision. Responding to the motion, defendant Harris asserts that it is now entitled to a trial de novo in the District Court, the ICC findings and order resulting in no more than a rebuttable presumption. Moreover, defendant contends that the evidence before the ICC is susceptible of only one characterization— that the scrap metal tariff was properly used to determine the charges—and submits that it is entitled to summary judg-

ment dismissing the EJ&E complaint. In short, defendant takes the position that the method for review of an ICC decision is not limited to the specific procedure established by Congress in 28 U.S.C. §§ 2321–2325 and that whenever the doctrine of primary jurisdiction has been applied in a pending District Court case, the litigants are automatically entitled to a retrial of the issues before the District Court.

■■ For the reasons advanced below, the position taken by defendant Harris is erroneous. The function of the judiciary in a situation involving primary jurisdiction is determined by the relation of the subject matter of the controversy to the regulatory responsibilities which have been legislatively placed in the hands of the administrative agency. In the instant case, the only issue before the court is one which is wholly within the discretion and particular competence of the Interstate Commerce Commission. Judicial review of the ICC order was not sought in the manner specified by statute and, under the circumstances of this case, this court's function is to apply the legal principle stated in § 6(7) of the Interstate Commerce Act, supra, in light of the ICC's findings, entering judgment accordingly. While, as noted below, the court has an interest in the sufficiency of the agency's decision and, in an appropriate situation, could re-refer an issue for a second administrative proceeding notwithstanding the parties' failure to seek judicial review, the case before the court does not warrant such extraordinary action.

## II

Plaintiff EJ&E asserts that whenever any matter referred to the ICC results in a final order it necessarily determines the outcome of the civil action which has been stayed pending agency decision and is not open to collateral attack. In support of its contention, it relies on Pennsylvania R. Co. v. United States, 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960). In that case, the issue of the reasonableness of certain rates had been referred

to the ICC under the doctrine of primary jurisdiction by the Court of Claims. Holding the subsequent ICC order subject to direct judicial review, Mr. Justice Black, speaking for the Court, noted that the ICC order finding certain rates unreasonable was not "a mere 'advisory opinion' * * * for if valid it forecloses the 'right' of the Railroad to recover [in its pending Court of Claims suit]". 363 U.S. at 205, 80 S.Ct. at 1133.

Defendant points out that, as distinguished from the question of applicable rate here involved, reasonableness of rates is a subject over which the ICC has been given plenary power and asserts that the binding effect of an ICC order is limited to actions involving that question. The legal principle upon which the quoted portion of the Court's opinion is based is not as narrow as defendant would construe it. However, neither is it as broad as the plaintiff contends.

■■ The effect of an agency determination—and hence the function of the court once that determination has become final—depends on the effect which judicial action will have on the statutory scheme of regulation. If an ICC determination as to the reasonableness of rates were subject to collateral attack in each of the district courts of the land, the regulatory function of the Commission would atrophy from impotence. Hence, as Justice Black pointed out, supra, once the steps for direct judicial review of the ICC decision have been taken (or, as here, are not pursued) and the order becomes final, the outcome of pending civil litigation is determined.

■ This principle applies with equal force to decisions involving the applicability of tariffs to particular commodities. The entire scheme of value-of-service ratemaking rests on a series of fine balances between theories of cost allocation and market conditions. If regulatory decisions—selecting one of many possible approaches to the problem on the basis of agency expertise—are mere "advisory opinions" which the courts may choose to modify or ignore, rational regulation is impossible.

■ The limits of allowable judicial action in cases such as the one before the court are fully consistent with the general principle that application of the concept of primary jurisdiction is but a preliminary step in the decisional process. Commenting on the roles of the court and administrative agency in such instances, Professor Jaffe, in a detailed examination of the subject recognizes the accuracy of the opinion expressed in dissent in United States v. Kansas City So. Ry., 217 F.2d 763 (8 Cir. 1955): following the ICC's determination of a tariff construction question, the referring court would simply "enter such judgment as the Interstate Commerce Commission dictates, without the exercise of any judicial function". 217 F.2d at 777. Jaffe, Primary Jurisdiction, 77 Harv.L.Rev. 1037, 1055 (1964). He notes, however, that the judicial review specified by statute is available to the parties before proceedings in the stayed civil action are resumed. Id. at 1055 n. 57.

■ In the instant case, the issue of tariff applicability was referred to the Interstate Commerce Commission. The particular expertise of the Commission is exercised so that the factual circumstances pleaded in the complaint, i. e., the "evidentiary" facts, may be appraised and interpreted, being transformed into "ultimate" facts which "serve as a premise for legal consequences to be judicially defined." Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). It is this process of applying expertise to characterize underlying facts and circumstances which comes under judicial scrutiny when direct review of an agency decision is sought. Once the agency decision is final, the court in which an action has been stayed is presented with the facts in a new form: as findings of ultimate facts by the agency. The validity of the agency fact finding process in relation to the evidence presented is an issue for direct review. Once the agency order is allowed

to become final, the validity of the administrative determination is established.

■ The function of the court, as stated in Far East, supra, is to define the legal consequences which flow from the facts thus established. In the instant case, it is to define the obligations and rights of the carrier and shipper given the fact that the general commodity rate was applicable to the shipment in controversy. As the Supreme Court has noted, the latitude which the courts have in stating the legal consequences does not depend on the presence or absence of primary jurisdiction. Hewitt-Robins v. Eastern Freight-Ways, 371 U.S. 84, 89, 83 S. Ct. 157, 9 L.Ed.2d 142 (1962). It is a matter of consistency with the congressional scheme. Cf. T.I.M.E. Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed. 2d 952 (1959).

Thus, for example, a court may properly award damages for a carrier's routing practices which were found "unreasonable" by the ICC, notwithstanding the fact that at the time of the shipment involved in the litigation, the charges imposed on the shipper were in accord with the ICC-approved tariff. Hewitt-Robins v. Eastern Freight-Ways, supra. And, as noted in General American Tank Car Corp. v. El Dorado Terminal Co., 308 U. S. 422, 433, 60 S.Ct. 325, 84 L.Ed. 361 (1940), defenses to an action which do not depend on any preliminary agency determination are not extinguished by the application of primary jurisdiction. See generally, Jaffe, supra, 77 Harv.L.Rev. 1037–38. However, as noted at the outset, no common law remedies are sought in this proceeding, nor have any defenses —other than the tariff applicability claim —been interposed.

### III

Defendant Harris points to language in Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958) and National Van Lines, Inc. v. United States, 326 F.2d 362 (7 Cir. 1964), which it contends obligate this court to treat the ICC findings as mere rebuttable presumptions and permit reargument of the tariff construction question here involved. Examination of these cases yields no such rule. Rather, they are fully in accord with the guiding principles set out above.

In Isbrandtsen, the Supreme Court noted that the judiciary was not bound by the Federal Maritime Board's approval of a particular dual-rate system. The Court pointed out that the reference to the F. M.B. was merely "a device to prepare the way * * * for a more informed and precise determination by the Court", 356 U.S. at 498, 78 S.Ct. at 862, and stated that administrative decisions were not controlling upon the courts (citing Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 [1944]). However, these references must be examined in light of the questions there before the Court. In Isbrandtsen the Court found that the rate system under consideration was illegal per se under § 14 of the shipping Act of 1916, 46 U.S.C. § 812. The fact that the initial F.M.B. consideration was proper under the doctrine of primary jurisdiction "did not signify that *the statute* left the Board free to approve or disapprove the agreements". 356 U.S. at 498, 78 S.Ct. at 861 (emphasis added).

■ The authority of an administrative agency is delineated by the terms of the statutory grant. The responsibility for construing the statutory authority rests with the judiciary. Hence, an inquiry to determine if the agency has exceeded its statutory power is a constitutional obligation of the courts. The refusal to apply the agency ruling upon finding that the bounds laid down by Congress have been traversed is not based on evidentiary insufficiency or disagreement with expert judgment, but is an exercise of judicial authority to preserve the legislative scheme.

The Court's decision in Pan American World Airways v. United States, 371 U. S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) confirms this approach. In that case, the Court found that the broad authority statutorily given the Civil Aeronautics Board covered the questions which the United States sought to litigate in an ac-

tion under the antitrust laws. Accordingly, the Court held that there was no room for separate judicial action and ordered the Sherman Act complaint dismissed. Isbrandtsen and Pan American both rest on the guidelines summarized in Hewitt-Robins v. Eastern Freight-Ways, supra: the latitude for judicial action in controversies such as the one before this court is determined by the imperative of preserving the consistency of the regulatory scheme designed by Congress.

Defendant's references to our Court of Appeals' recent decision in National Van Lines, Inc. v. United States, supra, are on a somewhat different footing. In National Van Lines, certain declaratory orders of the ICC were found to be appropriate for direct judicial review under the procedures specified in 28 U.S.C. §§ 2321–2325. In the course of its opinion, the Court of Appeals noted that in a subsequent action by the carriers against the United States to recover freight charges which had been deducted by the government and which the ICC had found should not have been billed, "the Commission ruling could serve as prima facie evidence against the carriers, since both the carriers and the Government were parties to the Commission proceeding". 326 F.2d at 373. If *other shippers* brought suits for refunds against the carriers, "the Commission report would be available to the courts for their guidance". Ibid.

Again, defendant focuses on the phrase "prima facie evidence" in the court's opinion, suggesting that the ruling would create a rebuttable presumption and no more. This characterization is inaccurate. The court, in referring to "prima facie evidence" in one case and "guidance" in the second-quoted portion of the opinion, intended merely to distinguish between the effect of the Commission order in an action involving parties to the ICC proceeding and its relevance in a similar case where one or both of the litigants were not so represented.

In the course of the Western Pacific decision, supra, holding that questions of tariff applicability should be referred to the ICC, the Supreme Court specifically noted that it adhered to the distinctions laid down earlier in Great Northern R. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922). The Court stated that "there would be no need to refer the matter of construction to the Commission if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it." 352 U.S. at 69, 77 S.Ct. at 168. Before applying an existing agency order to the facts of a controversy before the court instead of referring the specific matter to the Commission, the court must determine if that order is in fact relevant to the case before it. If the Commission order is relevant, it may be applied by the court even if the litigants were not parties to the agency proceeding. See Crancer v. Lowden, 315 U.S. 631, 62 S.Ct. 763, 86 L.Ed. 1077 (1942). In that sense, the agency order is available for the court's "guidance". However, if the order cannot be used to determine the controversy and regulatory expertise is involved, the court is not then free to use the prior determination as a "guide" in writing an interpretation of its own. In such a situation, the holding in Western Pacific, supra, would require referral of the issue to the regulatory agency.

When an issue is referred under the doctrine of primary jurisdiction, the agency order will deal directly with the facts of the case before the District Court. Accordingly, the court need not inquire as to the relevance of the order to the controversy before it. In that sense, as the Court of Appeals in National Van points out, the Commission order is "prima facie evidence". Absent the assertion of other defenses or a claim based on a common law remedy not inconsistent with the regulatory scheme, the judicial fact finding process is complete when the order is introduced. As noted in Crancer v. Lowden, supra, "[t]he meaning of the tariff had been determined by the Commission. It remained to the railroad only to collect the rates for which the tariff

called and for the District Court only to see that the railroad did collect them." 315 U.S. at 635, 62 S.Ct. at 765.

Accordingly, the language in National Van cited by the defendant is not a rule of decision (which would be contrary to the obligation set forth in Crancer v. Lowden, supra), but merely a statement of the procedural steps which must be taken when an existing Commission order is used to determine a controversy in the courts.

## IV

As a final alternative, defendant attempts to analogize this proceeding to those involving the enforcement of ICC reparation orders. The procedure for enforcing reparation orders against carriers is specified in 49 U.S.C. § 16(2). In such cases, the District Court—in a subsequent action for a money judgment—is required to review the Commission decision and determine if it is supported by substantial evidence. See New Process Gear Corp. v. New York Central R. Co., 250 F.2d 569 (2 Cir. 1958), cert. denied, 356 U.S. 959, 78 S.Ct. 996, 2 L.Ed.2d 1066 (1958); I.C.C. v. Atlantic Coast Line R. Co., 334 F.2d 46 (5 Cir. 1964).

In such cases, the scope of review by the District Court is identical to that which would apply had direct judicial review of the ICC order been sought. This result, however, does not stem from the fact that a money judgment is involved, but rather from the fact that an action seeking enforcement of the ICC order pursuant to § 16(2) is an alternative and not a supplementary remedy. It takes the place of the review procedure specified in 28 U.S.C. §§ 2321–2325 for other ICC orders. See Willamette Iron & Steel Works v. Baltimore & O. R. Co., 29 F.2d 80, 83 (9 Cir. 1928).

By amending 28 U.S.C. § 1336 in 1964, Congress specifically pointed to the procedure for reviewing ICC orders such as the one involved in this case. Defendant's attempt to analogize this proceeding to those under § 16(2) ignores this fact. Were we to accept defendant's contention, it would mean that a party to a

proceeding referred to the ICC would have two separate attempts to seek judicial review of the ICC order. Moreover, in view of the 1964 amendment to § 1336 noted supra, the two review proceedings would take place before the same court.

In view of the foregoing, the report and order of the Interstate Commerce Commission has become final and is determinative of the sole issue before this court.

## V

Defendant, in the course of its brief supporting *its* motion for summary judgment attempts to persuade the court that the ICC order respecting its shipment not only lacks any evidentiary basis, but compels this court to make the opposite finding. Since defendant failed to seek direct judicial review in which this contention would have been proper for consideration, its claims are not cognizable in the context of this proceeding. However, it should be noted that—apart from the interest of the litigants in the ICC order which may be exercised by seeking direct review—the court, being called upon to use the Commission's order as the basis for entering a judgment, has an independent interest in its sufficiency. Even if the parties have waived their right to review, the court would not be warranted in entering a judgment based on the ICC order unless it, too, is satisfied that the order is sufficient. If the court has substantial doubt, it should properly re-refer the matter to the Commission.

The Commission report and order in the instant case is an appropriate basis for decision. While a more detailed exposition of the relation of the character of the shipment to the costs of service would have been desirable, the Commission's finding that the used gunsights, as individually boxed and shipped, should not be treated by rail carriers as scrap metal subject to the lower tariff applicable to that commodity, even though both seller and purchaser considered them to have value primarily as scrap brass, is

not one which requires re-referral to the Commission.

## VI

 Plaintiff also seeks recovery of interest on the outstanding freight charges from February 29, 1961, the date of the shipment. Defendant does not address itself to the question of interest and it appears that under the general principles governing such cases, interest is to be allowed. See Miller v. Ideal Cement Co., 214 F.Supp. 717 (D.Wyo.1963).

Accordingly, plaintiff's motion for summary judgment will be granted and defendant's cross-motion for summary judgment denied. Judgment will be entered in favor of the plaintiff, Elgin, Joliet and Eastern Railway Company and against the defendant, Benj. Harris & Co., in the amount of $2,668.89 plus interest at five per cent (5%) per annum from February 28, 1961, without costs.