**NATIONAL ROOFING CONTRACTORS ASSOCIATION et al., Petitioners,**

v.

**Peter J. BRENNAN, Secretary of Labor, Respondent.**

**No. 73–1082.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1973.

Decided April 30, 1974.

Ira J. Smotherman, Jr., McNeill Stokes, Atlanta, Ga., Michael J. Hamblet, Chicago, Ill., for petitioners.

Harlington Wood, Jr., Asst. Atty. Gen., Eloise E. Davies, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before KILEY, Senior Circuit Judge, and PELL and SPRECHER, Circuit Judges.

KILEY, Senior Circuit Judge.

Petitioners,[1] representatives of employers in the roofing industry, filed their petition in this court, pursuant to 29 U.S.C. § 655(f),[2] to set aside a safety standard promulgated by respondent Secretary, acting by virtue of § 6(a) and (b) of the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 651 et seq., to protect workers on sloping roofs of buildings. We deny the petition.

OSHA is the "first comprehensive effort by the federal government to regulate safety and health conditions in the workplace."[3] In enacting OSHA Congress stated that the purpose is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b).

The Secretary was authorized in OSHA, § 651(b)(3), to set mandatory standards for safety and health of employees. In promulgating the standard before us he followed the statutory procedures in § 655(b). Briefly stated, those procedures are as follows: When the Secretary receives or develops information upon which he determines a standard is needed, he may request recommendations from an advisory commit-

---

1. Petitioners are an association of roofing contractors and individual roofers. The roofing and sheet metal industry was selected one of five "target industries" of the Occupational Safety and Health Act because in 1969 its record was 43 disabling work accidents per one million man hours as compared to 14.8 injuries for all manufacturing enterprises.

2. (f) any person who may be adversely affected by a standard issued under this section may at any time prior to the sixtieth day after such standard is promulgated file a petition challenging the validity of such standard with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review of such standard. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Secretary. The filing of such petition shall not, unless otherwise ordered by the court, operate as a stay of the standard. The determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole.

3. Morey, The General Duty Clause of the Occupational Safety and Health Act, 88 Harv.L.R. 988 (1973).

tee appointed by him. He then submits his proposal and the information he has received or developed to the committee. Upon receiving the committee's recommendations, he publishes the proposed standard and affords interested persons an opportunity to submit written data or comments.

Should objections be made to the proposal, and upon a request for a hearing, the Secretary is to publish in the Federal Register a notice specifying the proposal and set a time and place for a hearing. After the hearing he "shall" promulgate, or determine not to promulgate, the standard.

## I.

■ Petitioners contend that the standard is void because the composition of the advisory committee appointed by the Secretary did not comply with the requirement of § 656(b) that the committee be representative of employers as well as employees and public representatives.

## A.

Section 656(b) provides that any advisory committee appointed by the Secretary shall consist of not more than fifteen members and must include one or more designees of the Secretary of Health, Education and Welfare (HEW); "an equal number of persons qualified by experience and affiliation" to present the views of employers and employees; one or more representatives of state safety and health agencies; and "such other persons as the Secretary may appoint who are qualified by knowledge and experience . . . including one or more representatives of professional organizations of technicians or professionals specializing in occupational safety or health . . . "; but the number of professionals appointed cannot exceed the number appointed as representatives of HEW and state agencies.

Petitioners argue that no roofing industry member was appointed and that general contractors on the committee do not adequately represent them.

The Secretary, before the effective date of OSHA, had exercised his authority under the Contract Work Hours and Safety Standards Act of 1969, 40 U.S.C. § 333 et seq. (CWHSSA) by appointing a nine-man advisory committee to make recommendations for a safety standard to protect employees working on sloping roofs. After enactment of OSHA he enlarged the committee to the new requirements of fifteen members.

It is not sufficient to charge that because a roofing subcontractor is not appointed to the committee, petitioners are *ipso facto* prejudiced. There is nothing to show that, although roofing contractors may be the group most affected by the standards, general contractors in conjunction with worker representatives and the other representatives are not competent to determine suitable safety standards for employees working on sloping roofs. The testimony does not show that the general contractors prejudiced petitioners' position at the hearing. On the contrary, on this record the interests of the petitioners and the general contractors are plainly the same: general contractors must absorb the cost of safety devices required by the standard and they may be liable for subcontractor violations.[4]

Absent a showing of "specific prejudice" suffered by petitioners, we see no substance in the contention urged by petitioners that failure to appoint a representative of the roofing industry violated § 656(b). United States v. Pierce Auto Lines, 327 U.S. 515, 527–529, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

## B.

■■ Petitioners argue also that the CWHSSA and OSHA advisory committees were improperly composed.[5] We consider this argument frivolous.

---

4. OSHA Compliance Operations Manual, Chapters VII, X (1972).

5. The original advisory committee was formulated under CWHSSA. That the Secre-

As his affidavit before us states, CWHSSA member MacCollum was not appointed as an employer representative as petitioner erroneously contends, but as a public member. And, contrary to petitioner's claim, OSHA committee member Anania, an acting chief of the National Institute of Occupational Safety and Health, was a proper HEW designee. Finally, there is no merit in the claim that the CWHSSA committee had an unequal number of employer and employee representatives. Petitioners' contention that Mr. Burks was a public member is contradicted by a Department of Labor release announcing his appointment as a "management representative."

We hold that the standard before us is not void for failure of the Secretary to meet the requirements of 29 U.S.C. § 656(b) of OSHA in composing the advisory committee which recommended the standard. None of the cases referred to in petitioners' brief aids them in their contentions.[6]

## II.

The challenged safety standard states:

A catch platform shall be installed below the working area of roofs more than 16 feet from the ground to eaves with a slope greater than 4 inches in 12 inches without a parapet. In width, the platform shall extend 2 feet beyond the protection of the eaves and shall be provided with a guardrail, midrail, and toeboard. This provision shall not apply where employees engaged in work upon such roofs are protected by a safety belt attached to a lifeline.[7]

The "16 feet" height and "4 inches in 12 inches" slope standard departs from the standards previously promulgated by the Secretary of 20 feet for industry in general (the "national consensus")[8] and 10 feet for construction work, and a 3 inches in 12 inches slope requirement.

Petitioners contend that the departure is not supported by "substantial evidence in the record as a whole,"[9] and is "capricious, arbitrary and unreasonable."

Testimony, contentions and arguments, for petitioners at the hearing, and before us, are, first, that the 16 feet height is unnecessary—since overprotection makes workers careless, and less expensive devices are available; is without precedent; and compliance with it is too costly.[10]

The testimony that the 20 feet height was the appropriate standard implies that protection at some height was need-

---

tary could temporarily make use of it for his OSHA responsibilities is clear from the Senate Report: "It is the intent of the committee that the Secretary will develop health and safety standards for construction workers covered by Public Law 9–54 [CWHSSA] pursuant to the provisions of that law and that the Secretary will utilize the same mechanisms and resources for the development of health and safety standards for other construction workers newly covered by this act [OSHA]." On August 25, 1972 the nine-member CWHSSA committee was expanded to the fifteen-member OSHA committee.

6. Madden v. International Organization, etc., 259 F.2d 297 (7th Cir. 1958); Madden v. Int. Hod Carriers, 277 F.2d 688 (7th Cir. 1960); NLRB v. United Brotherhood of Carpenters, 261 F.2d 166 (7th Cir. 1958); Pinkett v. United States, 105 F.Supp. 67 (D.Md.1952).

7. 29 C.F.R. 1926.451(u)(3).

8. Section 655(a): "[T]he Secretary shall, as soon as practicable during the period beginning with the effective date of this chapter and ending two years after such date, by rule promulgate as an occupational safety or health standard any national consensus standard, . . . unless he determines that the promulgation of such a standard would not result in improved safety or health for specifically designated employees. . . ."

9. Section 655(f), Judicial Review, provides: "The determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole." See Chicago v. FPC, 147 U.S.App.D.C. 312, 458 F.2d 731, 744–745 (1971); Associated Industries v. Dept. of Labor, 487 F.2d 342 (2nd Cir. 1973).

10. Written comments were aimed at the cost of making catch platforms which would range upward of $750.00 and in some instances exceed the cost of the roofing.

ed. Whether that should be 20 feet or 10 feet or 16 feet was considered by the committee. The 20 feet standard was rejected for the reason that a safer standard was needed in order to protect against falls from lower roofs which resulted in more serious injuries.[11] The Secretary recognized the factor of cost of catch platforms and left room in his promulgation for "temporary parapets," to be built by contractors, which could qualify under the standard as alternatives to catch platforms. We think this will enable those covered by the standards and sensitive to the costs involved for catch platforms to use ingenuity in providing less costly alternatives which could qualify. Finally, the committee could well have ignored the claim that overprotection makes workers careless.

■ The fact that the American National Standards Institute (ANSI) adopted the "national consensus" standard of 20 feet, and that several states[12] had adopted the same or greater height standards, is not binding on the Secretary. In fact, OSHA was enacted to supply the protection Congress deemed lacking in state regulations.[13] He is required under § 655(a) to determine whether a standard different from the "national consensus" would result in improved safety or health.

Similarly, while a layman would see little difference, perhaps, between a 4 inches and 5 inches in 12 inches slope, it was within the Secretary's discretion to choose the more gentle slope. As one committee member stated, "You can work on a 4 inch roof. You get up to 5 inches or 6 inches and this is real tough."

Petitioners also argue that safety belts, which can be used in place of scaffolds, are dangerous, since ropes purporting to hold the workers safely have caused tripping of employees and more injuries than that protection prevented. The committee properly recognized the self-serving element implicit in this argument and cited the experience of iron workers who originally resisted safety belts but have come gradually to accept them as effective safety equipment.

Finally, petitioners argue that the majority of injuries to employees engaged in roofing were due not to the lack of adequate safety protection but to negligence of workers, and that catch platforms in preventing falls could cause greater injury than the falls, and that the best protection against employee injury was efficiency on the part of employers and due care on the part of employees. Apparently the committee found, as we find, this argument unpersuasive. There is no showing in the statistics to bear out the first argument with respect to the negligence of workers, no convincing testimony that catch platforms would cause greater injuries, and the statistics would seem to indicate that employers have not performed their part in providing effective equipment for their employees.[14]

The committee knew of the 273 fatal or near-fatal falls from roofs in one year from sloping, and even flat, roofs caused by holes therein, tripping on loose shingles, or the weather, as well as the high injury rate among roofing and sheet metal workers.

■ An abundant record of oral and written statements, statistics, and testimony underlies the Secretary's standard. As previously noted, the advisory committee is made up of representatives of employers, employees, technical and professional organizations, and state agencies, and the HEW designate. Reading

---

11. The purpose of the 16 feet level was to include two-story buildings and exclude single-story buildings. 37 Fed.Register 27599, Dec. 16, 1972.

12. Including New York, Connecticut, Rhode Island and New Jersey.

13. Comment, The Occupational Safety and Health Act, 34 La.L.R. 102 (1973).

14. In early 1970, "[p]rivate industry and state regulation were not doing an adequate job of insuring health and safety in the workplace." Gross, Occupational Safety and Health Act: Much Ado about Something, 3 Loyola Univ.L.J., 247, 249 (1972).

the transcript of the committee's final meeting has satisfied us that the committee members understood and considered the oral and written testimony at the hearing and were well informed about the petitioners' viewpoints and about what safety standards were reasonable. The fundamental issue for the committee was whether the 16 feet height, 4 inches in 12 inches slope, or the 20 feet height, 5 inches in 12 inches slope, was appropriate to protect employees. We conclude that there is "substantial evidence in the record as a whole" to support the standard promulgated by the Secretary, Chicago v. FPC, 147 U.S.App.D.C. 312, 458 F.2d 731, 744–745 (1971), and that the standard is not "capricious" or "arbitrary."

### III.

■ Finally, petitioners contend that the challenged standard is unconstitutionally void in violation of their equal protection and due process rights and because of the standard's vagueness. There is no merit in the contention.

Petitioners argue that the 16 feet height standard before us—with potential civil and criminal liabilities attached for its violations [15]—applied to the construction industry is more restrictive than the 20 feet standard applied to employers outside the construction industry [16]; that the standard bears no rational relationship to the purpose of OSHA; and that the discrimination is so unjustifiable as to violate due process under Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

Under the applicable regulations, the 16 feet standard covers all "substantial" roofing work, including "work for construction, alteration and/or repairs including painting and decorating." [17] While we are not persuaded by the Secretary's argument that because 1926.-451(u)(3) covers construction work, and 1910.28(s)(3) covers maintenance work,

the former is more dangerous, we agree with his argument that all persons doing the same kind of work on roofs are subjected to the 16 feet standard; that he addresses safety problems "by one step at a time"; and that his failure to apply that standard to the varying situations at this time is not a basis for a claim of invidious discrimination.

■ We therefore hold that the Secretary did not deny due process to the roofing industry by not applying the 16 feet standard at this time to the roofing maintenance industry. A rational "one step at a time" approach defeats a constitutional claim. Jefferson v. Hackney, 406 U.S. 535, 546, 92 S.Ct. 1724, 32 L. Ed.2d 285 (1972). What the Secretary has done here is to select one phase of the construction industry for a remedial standard. He may have passed over, temporarily, another phase of the industry, but that neglect is not a denial of constitutional rights.

■ We need not discuss petitioners' claim that the standard is so "vague and unintelligible" to those in the industry as to deny them due process. A reading of the testimony and oral statements in the record is sufficient to convince us that the standard is neither.

For the reasons given, the petition is denied.

PELL, Circuit Judge (dissenting).

The Occupational Safety and Health Act of 1970 (OSHA), brought into being for the laudable purpose of assuring "so far as possible every working man and woman in the Nation safe and healthful working conditions," nevertheless, in its application as manifested and its potential enforcement as implicit in the present case, presents a frightening prospect to employers who are not necessarily any less interested in the safety of their employees than the employees themselves. Accordingly, I respectfully dissent.

15. 29 U.S.C. § 666.

16. 29 C.F.R. 1910.28(s)(3).

17. 29 C.F.R. 1910.12(b).

As an initial matter, it appears to me that the majority opinion errs in upholding a standard which followed consideration of the subject matter by an advisory committee on which there was no person "qualified by experience and *affiliation*" to represent the involved employers, roofing subcontractors, as the statute clearly required. (Emphasis added.)

I find it no answer to say that there were general contractors on the advisory committee and that their interests are the same as the roofing subcontractors because the general contractors must absorb the cost of safety devices. The simple fact is that, insofar as it is humanly possible to do so, both the general contractor and the subcontractor will pass along any increased costs to the ultimate consumer.[1] Since the standard adopted will affect very few commercial or industrial buildings the prime recipient of the increased costs will be the home builders. It will be they who will be "sensitive to the costs."

I do not conceive that it was contemplated that OSHA would eliminate all accidents arising from the construction of roofs. The "so far as possible" proviso makes that clear. The only solution for an *in toto* eradication of such accidents would be a complete prohibition against anyone working on roofs, but I do not envisage that the veneration paid in the American dream to a roof over one's head is to be so lightly cast aside.

At oral argument, Government counsel stated that while there are no directions anywhere in the Act for taking economic considerations in view, there are suggestions that the standards must be feasible and as a matter of fact in promulgating the standards there had been an effort to take economic considerations in view.

The petitioners fail to perceive that this was accomplished in the case of the present standard and contend, correctly in my opinion, that they were prejudiced by not having representatives of their employer group on the advisory committee.

The cost factor enters the picture in another aspect in that the Secretary argues that "section 7(b) cannot reasonably be read to require a representative from each sub-group affected by a particular standard because such an interpretation would require a new advisory committee for each separate construction safety standard." This argument ignores the fact that on this particular standard the roofers were not a subgroup but instead were the only affected employers.

Further, the roofers can scarcely be said to be some minuscular segment of the construction syndrome. They are not the craftsmen who come to the residence under construction to deliver and install the thermostat or telephone; they play a major part in the construction. Also, they occupy a significant part in the safety picture. As the Government concedes, the Secretary established priorities for setting standards which include "a target industry program aimed at industries with injury frequency rates significantly above the all industry average." The Secretary designated the roofing and sheet metal industry as one of the first five such target industries, yet he put not a single representative with affiliation with the employer group on the advisory committee.

The majority opinion accepts the Government position that the petitioners cannot raise the present issue absent a showing of specific prejudice, citing

---

1. The petitioners point out that the written comments received by the Secretary of Labor suggested that the cost on a residential roofing job would be increased by anywhere from 25% to 100% or more if catch platforms are required. These letters further suggested that since most "legitimate" roofing companies would bid on this basis, home- owners would probably reject their bids and contract with "jack leg" roofers who could do the job for less because they would ignore the catch platform requirement. To this extent, of course, the roofing subcontractors are subject to a different economic impact than that of the general contractors.

United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 527–529, 66 S. Ct. 687, 90 L.Ed. 821 (1946).

In *Pierce*, two Interstate Commerce Commission proceedings were held on separate applications by the appellants and appellees for certificates of public convenience and necessity and necessity for the same route of operation. Two hearings were held, to which each of the litigants were parties. The hearings were held at substantially the same time and place, and each party was represented at each and given full opportunity to present evidence and cross-examine all witnesses. Much of the evidence was applicable to both applications. The error urged and found to be nonprejudicial and thus not a basis for reversal was the Commission's apparent consideration of both records together in deciding each application.

It appears clear in the words of the Court that no prejudice or harm whatsoever could have resulted to either party from this "highly technical objection that the Commission in the final state of forming its judgment, could not in either case take account of what had been done in the other, notwithstanding the closely related character and objects of the applications and the prior proceedings. The contention in its farthest reach amounts to a legal version of the scriptural injunction against letting one's right hand know what one's left hand may be doing." 327 U.S. at 529.

The basis of judicial review of most administrative rulings has been well stated by Judge Will in Elgin, Joliet &

Eastern Ry. v. Benj. Harris & Co., 245 F.Supp. 467, 472 (N.D.Ill.1965):

> "The authority of an administrative agency is delineated by the terms of the statutory grant. The responsibility for construing the statutory authority rests with the judiciary. Hence, an inquiry to determine if the agency has exceeded its statutory power is a constitutional obligation of the courts. The refusal to apply the agency ruling upon finding that the bounds laid down by Congress have been traversed is not based on evidentiary insufficiency or disagreement with expert judgment, but is an exercise of judicial authority to preserve the legislative scheme." Quoted with approval in Board of Public Instruction v. Finch, 414 F.2d 1068, 1074–1075 (5th Cir. 1969).

In the present case, of course, by virtue of explicit congressional language there is a sufficiency of evidence problem as "the determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole." 29 U.S.C. § 655(f).[2]

In my opinion, the prejudice is implicit when that which the legislation required, *i. e.*, employer-affiliated representatives, was given no recognition. In sum, it appears to me that the petitioners have put the matter correctly in arguing that "the promulgation of OSHA standards by the Secretary with an Advisory Committee on which the affected employers are not represented is 'clearly disruptive of the legislative *scheme*' [citing *Board of Public Instruc-*

---

2. In its brief filed in this appeal, the Government argued at length that the plain words of the statute did not mean what they purported to say, in view of the informal rule-making procedures involved and the legislative history. The Secretary's position in this respect was undercut by post-brief decisions, Associated Industries of New York State, Inc. v. United States Department of Labor, 487 F.2d 342 (2d Cir. 1973); Dry Color Mfrs. Ass'n, Inc. v. Department of Labor, 486 F.2d 98 (3d Cir. 1973); and Florida Peach Growers Ass'n, Inc. v. United States Department of Labor, 489 F.2d 120 (5th Cir. 1974).

The Secretary also presented the argument, the logic of which escapes me, that even if his "determinations" had to be supported by substantial evidence this did not mean that his "Rule" had to be so supported.

*tion, supra*] to encourage and perfect occupational safety and health programs and practices and provide their employees with a safe and healthful working environment."

Inasmuch as I consider the most serious vice in the present proceedings to be the nebulosity of the standard actually adopted in view of the drastic enforcement potential of OSHA, I will not tarry long on the matter of sufficiency of the evidence although it appears that what happened was that the advisory committee recommended a compromise figure which was utilized by the Secretary. I find a paucity of relevant evidence which a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

I do note the following specific matters on the sufficiency question. Of the falls from roofs which had been reported, a substantial number had nothing to do with the pitch of the roof, *e. g.*, falls resulting when a workman backs off a roof while using power equipment or those resulting from falling through holes in the roof.[3] At first blush, I would have little sympathy with the petitioners' arguments about the dangers created by safety belts since they apparently were not too concerned about this provision if the roof height of 20 feet had been adopted. However, this lack, if the 20 foot level were adopted, does not mean that the safety belt alternative could be safely utilized, or even that it would ever be utilized since another standard, 29 C.F.R. § 1926.104 (1972), requires the line to be anchored or secured to a structural member so as to be capable of supporting a dead weight of 5400 pounds. The significant factor on the safety belts is that I find no evidence that other than cursory attention

was given to these as a practical alternative to the catch platform.

What appears to me to be the most persuasive basis for remanding and requiring a new standard to be promulgated is not what was included but what was omitted. Evidence indicated that toeboards with safety jacks or cleats were the normal and best safety devices and could be utilized at a reasonable cost. Yet, at the public hearing in July 1972, a member of the Department of Labor Office of Solicitor observed that this was "something which at least I was not aware of, and it doesn't seem all that unreasonable."

In promulgating his final standard the Secretary adverted to the toeboard possibility as follows:

"At the hearing a contention was made that in certain circumstances a temporary device constructed on a sloped roof could form an economical and equally safe alternative to a catch platform. To the extent that such devices can be said to constitute secure temporary parapets, they may qualify as an acceptable means of protection. Such a solution requires no amendment to the standards as they already permit parapets as an alternative to catch platforms."

During oral argument, Government counsel observed that the temporary parapet had been included in the standard, "although they do not make it as tidy as it was before they were included. They have been included for economic considerations to provide builders *who are willing to take the risk of satisfying compliance officers* by building their own safety devices a chance to do so." (Emphasis added.)

The majority opinion also adverts to this phase of the case in a frame of reference of employers using "ingenuity in

---

3. The expertise of the advisory committee hopefully was not exemplified by the statement on the slope matter by one of the committee members: "a friend of mine said, who has done a good deal of this, he said, 4

is really not bad but he said 5, particularly if it is a little damp, he said, 'I would not want to be working up there without some kind of protection.' "

providing less costly alternatives which *could* qualify." (Emphasis added.)

It appears to me that it should be beyond dispute that no standard of conduct should be so vague and uncertain as that which has now resulted where a substantial part of the economy has the Hobson's choice of alternatives, one being one with which they say they cannot live economically and the other being of the calculated risk or chance type.

This is particularly true when we examine the present statute. Without parsing OSHA, it is fair to say that it empowers a federal government inspector to arrive unannounced, inspect a business, and summarily impose fines which can be as much as $1000 for each violation of a safety standard. The statute in application becomes frightening when it is realized that the employer who chooses to use "a temporary device constructed on a sloped roof" is in compliance or in violation dependent upon the individual inspector's judgment as to whether the device is a parapet. Webster's definitional "low wall or similar barrier . . . to protect the edge of a . . . roof . . . or other structure" may prove challenging to the employer who is a devotee of Russian roulette but scarcely seems to equate with what the Secretary stated at the time he promulgated the standard as hereinbefore quoted.

In view of the fact that both civil and criminal penalties may be imposed under OSHA for violation of the standard, it should, to meet due process requirements, clearly warn what conduct is prohibited or required. "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939).

In final analysis, it appears to me that because OSHA thrusts upon the Secretary the responsibility of seeing to it that every working person is provided with safe working conditions in a country with an infinite variety of occupations exposed to possible injury hazards, the Secretary is confronted with a monumental task. Mistakes in determinations during the early period of the responsibility would not only be possible but because of the widespread range of responsibility not unlikely. This would be true despite the fact that the states for some years by legislation and regulation have prescribed rules the purpose of which was to achieve safe working conditions. In addition to direct state action, safety guidelines have been provided by the American National Standards Institute. It is not surprising, and indeed is suggested by the record here, that a natural human impulse, not totally lacking in logic, would come into play by those not possessed of particularized expertise, viz., that Congress has apparently been of the opinion that federal legislation is needed in the present area not only to achieve uniformity in controlling laws but in making working conditions safer generally than they now are, so we will therefore take the present requirements, whatever they may be, and make them more stringent. It, of course, should not have necessarily followed that in any given area the existing requirements were inadequate.

In view of the multiplicity of problems and their broad range in many differing and complex contexts, it should have been particularly necessary that the advisory committees be, by virtue of the composition expressed by Congress, prepared to bring an expertise not here possessed to bear on the differing problems.

The cases are replete with references to the *deference if not reverence to be* accorded to administrative expertise. However, administrative expertise should partake of something more explicable and supportable than Eleusinian mysteries. The uncertainty interjected into the enforcement process by the parapet reference necessitates in my opinion setting aside and vacating the order of the Secretary and remanding for con-

sideration by a properly constituted advisory committee to be followed by promulgation of a new standard realizing the maximum safety of working conditions consistent with the realities of feasibility and enforceability.