**SOUTHERN OHIO BUILDING SYSTEMS, INC., Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Ray Marshall, Secretary of Labor, Respondents.**

No. 79–3352.

United States Court of Appeals, Sixth Circuit.

Argued March 31, 1981.

Decided May 28, 1981.

Gary W. Auman, Smith & Schnacke, Dayton, Ohio, for petitioner.

Ray H. Darling, Exec. Secretary, Occupational Safety and Health Review Com'n, Michael H. Levin, Allen H. Feldman, Appellate Litigation, John R. Bradley, U. S. Dept. of Labor, Robert E. Kopp and Ronald Glancz, U. S. Dept. of Justice, Appellate Sec., Civil Division, Marleigh Dover Lang, Washington, D. C., for respondents.

Before LIVELY and KEITH, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

LIVELY, Circuit Judge.

This is a petition to review a final order of the Occupational Safety and Health Review Commission (OSHRC or the Commission) holding that the petitioner Southern Ohio Building Systems, Inc. (Southern Ohio) violated the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.* (1976) (the Act). The specific finding was that the general duty clause, section 5(a)(1) of the Act, 29 U.S.C. § 654(a)(1), was violated when two employees of Southern Ohio worked at an eave of the roof of a building under construction without any fall protection. This finding was made by an administrative law judge following a hearing and became the final order of the Commission when it failed to grant Southern Ohio's petition for discretionary review. We grant the petition for review and reverse the order of the Commission.

## I.

The citation upon which the complaint in this case was based was filed by an OSHA compliance officer who was inspecting Southern Ohio's construction site in connection with a previous unrelated accident. The compliance officer stated at the hearing that he saw two employees of Southern Ohio working at an eave of the roof, approximately 16 feet above the ground, and that they were leaning over the edge of the roof "applying something." He observed that the workers had no safety belts or tied-off lanyards to prevent a fall. The employees were engaged in putting a roof on an addition to an existing building. The officer made rough measurements and stated that he "could call it" 16 feet above the ground at the eaves and 20 feet at the peak of the roof. The roof was nearly flat, having a rise or slope of 1 inch in 12 inches. The surface beneath the eaves was dirt. The witness stated that his observation occurred on a windy day. Though he had no way of measuring the wind, he heard on his car radio a short time after observing the workers at the roof eave that gusts of up to 27 miles per hour had been recorded at an airport 4 or 5 miles away. This report accorded with the officer's observations.

This witness testified that he had never seen safety belts or tied-off lanyards used to protect other individuals working on roofs. However, he had seen catch platforms and scaffolding "during the course of construction of similar type buildings ... for the benefit of those individuals working on roofs." No dimensions, roof pitch or other description of the "similar type buildings" was given by the witness.

The officer said he had investigated cases of injuries from falls or less than 16 feet. He described one fatal fall some four years earlier from a roof "20 feet or more" in height to a floor. He made no estimate of the pitch of the roof from which this fatal fall took place. It is clear from the entire testimony of the witness that he believes all work more than four feet above the ground is dangerous and calls for protective devices.

The other witness for the Department of Labor was also an OSHA compliance officer. He testified that he had observed various safety devices being used for the benefit of persons working on roofs at construction sites. He referred to buildings with steel structures and laminated metal sidings as "similar" to the one being built by Southern Ohio at the time of the citation. However, when he referred to specific instances

of the use of safety devices, he gave virtually no descriptions to provide a comparison with the building of Southern Ohio. The witness said he had observed lifelines, belts and lanyards at a building site two and one-half years earlier and a "netting device" at one three years earlier. He gave no particulars as to the slope of the roofs involved, the height of the workers above the ground and whether the surface beneath them was earth or concrete. The witness also described a construction site he had visited some two years earlier where a "ladder-jack scaffolding" with guardrails was being used. However, he estimated that the lowest point of the roof of the building, at the eaves, was 25 feet above the ground and that the high point was 35 feet. He said nothing about the pitch or slope of the roof. This witness also testified that he had seen a couple of serious fall accidents—one from ten feet to concrete and another from 17 feet to dirt—but he gave no indication that the construction situations were similar to that of Southern Ohio.

## II.

The purpose of the Act is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions...." 29 U.S.C. § 651(b). To achieve this goal section 5(a)(2) of the Act requires employers to comply with specific standards promulgated by the Secretary of Labor. 29 U.S.C. § 654(a)(2). In recognition of the fact that every conceivable hazard in workplaces cannot be covered by specific standards, the Act also contains section 5(a)(1), the "general duty clause," which provides that every employer "shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees...." 29 U.S.C. § 654(a)(1). See *Bristol Steel & Iron Works v. O.S.H.R.C.*, 601 F.2d 717, 721 (4th Cir. 1979).

In *Continental Oil Co. v. O.S.H.R.C.*, 630 F.2d 446, 448 (6th Cir. 1980), *cert. denied*, — U.S. —, 101 S.Ct. 1481, 67 L.Ed.2d 613 (1981), Senior Judge Phillips described the burden of the Department of Labor in general duty clause cases as follows:

> In establishing a violation of the general duty clause, it is incumbent upon the Secretary to prove "(1) that the employer failed to render its workplace 'free' of a hazard which was (2) 'recognized' and (3) 'causing or likely to cause death or serious physical harm.'" *Empire-Detroit Steel v. OSHRC*, 579 F.2d 378, (6th Cir. 1978).

(Footnote omitted). The court also adopted a definition of "recognized hazard" previously enunciated in other opinions and commentaries:

> The question of whether a hazard is recognized goes to the knowledge of the employer, or if he lacks actual knowledge, to the standard of knowledge in the industry—an objective test. *Marquette Cement Manufacturing Co., supra*, 568 F.2d [902] at 910; *National Realty and Construction Company, Inc. v. OSHRC*, 489 F.2d 1257, 1265, n.32 (D.C.1973); 116 Cong.Rec. 38377 (1970); Morey, *The General Duty Clause of the Occupational Safety and Health Act of 1970*, 86 Harv. L.R. 988, n.37 (1973).

*Id.* Examining the present record in light of these pronouncements, we conclude that the Secretary failed to carry his burden of proof and that the order of the Commission is not supported by substantial evidence.

## III.

■ Both witnesses for the Department of Labor appear to have treated the burden of the Secretary as requiring only a showing that the hazard of falling from an elevated workplace is likely to cause death or serious injury. There was no attempt to show that the particular activity referred to in the evidence and found by the administrative law judge to be a violation—"working at an eave of the roof without any fall protection"—is a recognized hazard. Southern Ohio's witnesses disclaimed any knowledge that such a hazard was recog-

nized by it or others in the roof construction industry. The Department of Labor introduced no proof which could be held to satisfy the objective test of whether such a hazard is recognized in the industry. All that was offered was testimony by the two compliance officers that they had seen various protective devices used in "similar construction" on several occasions. Careful examination of the transcript reveals that "similar construction" referred to steel structures generally without reference to the actual height and slope of roof and other dimensions of the Southern Ohio building. The testimony of these witnesses about serious fall accidents, lacking any details as to conditions surrounding the incidents or their frequency, was not sufficient to support a finding that a hazard should have been recognized. This testimony fell far short of establishing that the roof construction industry recognized a hazard to employees working on the eaves of a roof having a 1 inch in 12 slope, sixteen feet above the ground, without "any fall protection."

Though he made no finding of fact on the subject, the administrative law judge stated in the body of his decision that the work site was subject to strong gusting winds at the time the compliance officer observed the workers at the edge of the roof. In the "Discussion" portion of his decision the administrative law judge stated, "The position in which the two employees were working clearly demonstrates that a fall was likely to occur." When the entire decision is considered it appears to reflect a finding that the evidence disclosed a hazard so obvious that its recognition by all reasonable people may be presumed. We cannot accept this view of the evidence. There was no evidence of the level of skill of the employees who were observed by the compliance officer. As regular employees of a construction company involved in roofing work they may not be presumed to be unaware of the necessity for greater care as one approaches the edge of a roof. As the court stated in *Diamond Roofing Co. v. O.S.H.R.C.*, 528 F.2d 645, 650 & n.11 (5th Cir. 1976):

Furthermore the practice of the roofing industry is to cover or guard roof holes and openings, which present a serious and unexpected hazard to roofers, but not to guard the roof perimeter, which is an obvious danger of which roofers are highly conscious.... Petitioners' employees are roofers, who would not mistakenly expect the roof perimeter to be guarded, not general construction workers, who would be accustomed to working on railed or walled as well as open-sided floors.

The fact that serious injury may occur in a fall from a roof is not proof that working on a roof is likely to produce a fall. Yet this is the very logic which both witnesses for the Department and the administrative law judge appear to have indulged.

Furthermore, the evidence concerning weather conditions was not sufficient to support a finding that a hazard so obvious as to require recognition existed. The only witness on wind conditions at the time the employees were observed admitted he made no measurements at the site, could not remember whether the building was in an exposed or a sheltered location and relied on a radio report of gusting conditions some distance away from the work site at an unascertained time. Further, this witness made no estimate of the steady velocity of the wind on the day in question, but merely stated that the reported gusting conditions accorded with his observations. An expert witness for Southern Ohio testified that although strong gusts relative to a steady wind could surprise and endanger roof workers, such workers can compensate for a steady wind. There is a total lack of proof on an essential fact—whether the velocity of the gusts was only slightly higher than that of the steady wind or so much higher that the gusts created an obvious danger to the workers. The evidence of wind conditions was not sufficient to relieve the Secretary of his burden of establishing the existence of a recognized hazard.

Our decision in this facet of the case should not be viewed as interfering with proper application of the general duty

clause. In cases where the evidence establishes that employees have been exposed to obvious danger the general duty clause may be the basis of a finding of violation. *E.g., Bethlehem Steel Corp. v. O.S.H.R.C.*, 607 F.2d 871 (3rd Cir. 1979). There it was shown by clear proof that a crane was operated in near-blizzard conditions. Even with detailed evidence of the adverse weather conditions the court also relied on the fact that a recognized standard of the industry was violated. The contrast between the proof of weather conditions in *Bethlehem Steel* and that in the instant case is notable.

### IV.

■ The administrative law judge made an alternative finding that Southern Ohio violated 29 C.F.R. § 1926.28(a).[1] Such a violation was not charged either in the citation or in the complaint and neither party directed proof or argument to the regulation. Section 1926.28(a) is similar to the general duty clause of the Act in that it prescribes a general standard rather than a specific one. This court has dealt with the proof required to establish a violation of this regulation:

> We hold that § 1926.28(a) requires an employer to require the wearing of appropriate safety equipment by his employees whenever a reasonably prudent employer, concerned with the safety of his employees, would recognize the existence of a hazardous condition and protect against that hazard by the means specified in the citation. This holding is consistent with our decision in *Schriber Sheet Metal & Roofers, Inc. v. OSHRC*, 597 F.2d 78 (6th Cir. 1979), adopting a similar test for compliance with the general duty clause (section 5(a)(1) of the Act).

*Ray Evers Welding v. O.S.H.R.C.*, 625 F.2d 726, 731 (6th Cir. 1980). *See also B. & B. Insulation, Inc. v. O.S.H.R.C.*, 583 F.2d 1364,

1372 (5th Cir. 1978). It is clear from our discussion of the evidence that the Secretary did not establish a § 1926.28(a) violation in the present case.

### V.

■ Reversal of the Commission's order in the present case is required for yet another reason. The Secretary has promulgated a specific regulation which requires a safety device for the protection of workers on roofs, 29 C.F.R. § 1926.451(u)(3):

> (3) A catch platform shall be installed below the working area of roofs more than 16 feet from the ground to eaves with a slope greater than 4 inches in 12 inches without a parapet. In width, the platform shall extend 2 feet beyond the protection of the eaves and shall be provided with a guardrail, midrail, and toeboard. This provision shall not apply where employees engaged in work upon such roofs are protected by a safety belt attached to a lifeline.

In *Langer Roofing & Sheet Metal, Inc. v. Secretary of Labor*, 524 F.2d 1337, 1339 (7th Cir. 1975), the court held that § 1926.-451(u)(3) is the only regulation which expressly applies to roof edges and that it does not apply to flat roofs and specifically exempts roofs having slopes of less than 4 inches in 12. The determination that roofs with slopes of less than 4 inches in 12 are exempt from the requirements of the regulation was based on a statement of the Secretary, made at the time of adoption of § 1926.451(u)(3), that "roofs with lesser slopes were not covered because such slopes did not present a substantial danger of falls. 37 Fed.Reg. 233 (Dec. 2, 1972)." *Id.*

In *R. L. Sanders Roofing Co. v. O.S.H.R.C.*, 620 F.2d 97 (5th Cir. 1980), an employer was cited under the general duty clause for failing to place guardrails or a protective platform around the perimeter of a flat roof where its employees were working. The court held that an employer, entitled to

---

1. **§ 1926.28 Personal protective equipment.**
   (a) The employer is responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions or where this part indicates the need for using such equipment to reduce the hazards to the employees.

fair notice that he may be charged with a statutory violation, "could not have been sufficiently apprised of his potential liability under the general duty clause for failing to erect a catch platform in light of the language of section 1926.451(u)(3)." *Id.* at 100. This language applies squarely to the present case. The *Sanders* court also held that there was no violation of the general duty clause in failing to install a guardrail since falling from a flat roof is not a hazard recognized in the roofing industry. The same is true of the danger of falling from a roof having a slope of less than 4 inches in 12 which is 16 feet high at the eaves.

We agree with the statement of the court in *B. & B. Insulation, Inc. v. O.S.H.R.C.*, *supra*, reiterated in *Sanders*:

> Where the Government seeks to encourage a higher standard of safety performance from the industry than customary industry practices exhibit,[13] the proper recourse is to the standard-making machinery provided in the Act, selective enforcement of general standards being inappropriate to achieve such a purpose.[14] The use of standard-making procedures assures that not only would employers be appraised of the conduct required of them and responsibility for upgrading the safety of the industry would be borne equally by all its members, but the resulting standard would benefit from input of the industry's experts,[15] both employer and employee, cost and technology obstacles faced by the industry could be weighed, and more interested parties can participate in the process.

[13] "In the area of safety, ... the Secretary is not restricted by the status quo. He may raise standards which require improvements in existing technologies or which require the development of new technology ...." *Society of Plastics Industry, Inc. v. OSHA*, 509 F.2d 1301, 1309 (2d Cir.), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975) (standard prohibits worker exposure to concentrations of vinyl chloride).

[14] For a discussion of standards formulation through administrative rulemaking rather than ad hoc adjudication, *see Securities & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). The Court advised "The function of filling the interstices of the [Holding Company] Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future."

Arguments against ad hoc standard setting in application of the Act's general duty clause are presented in Andrews and Cross, *Defending An Employer Against An Alleged Violation of the General Duty Clause*, 9 Gonzaga L.Rev. 399, 408–09 (1974); Morey, *The General Duty Clause of the Occupational Safety and Health Act of 1970*, 86 Harv.L.Rev. 988, 992–93 (1973). *But see, National Realty & Constr. Co., Inc. v. OSHRC*, 160 U.S.App.D.C. 133, 142, 489 F.2d 1257, 1266 n.37 (1973).

[15] *See generally, National Roofing Contractors Ass'n v. Brennan*, 495 F.2d 1294 (7th Cir. 1974), discussing promulgation of construction industry standards.

When the Secretary determines the need for a specific standard, he may receive comments from an advisory committee which must include persons qualified by experience and affiliation to present the views of employers and employees in the industry. 29 U.S.C.A. §§ 655, 656(b). The proposed standard is published and interested persons are permitted to submit written comments and may demand a public hearing on the proposal. 29 U.S.C.A. § 655(b)(2), (3).

Viewed in the light of a constitutionally applied regulation, B&B's challenge of the evidentiary basis for the Commission's decision must be sustained.

583 F.2d at 1371–72 (footnote 16 omitted).

The petition for review is granted and the order of the Commission is vacated and set aside.