**LOCUST CARTAGE CO., Inc., Plaintiff, Appellant,**

v.

**TRANSAMERICAN FREIGHT LINES, INC., Defendant, Appellee.**

No. 7498.

United States Court of Appeals, First Circuit.

Aug. 3, 1970.

Arthur E. Nicholson, Boston, Mass., with whom Harold M. Linsky, Boston, Mass., and Mary E. Kelley, Medford, Mass., were on brief, for appellant.

Stephen J. Paris, Boston, Mass., with whom Alan G. Miller, Boston, Mass., was on brief, for appellee.

Before ALDRICH, Chief Judge, COFFIN, Circuit Judge, and FORD, District Judge.

COFFIN, Circuit Judge.

The Motor Carrier Act of 1935 forbids common carriers to engage in transportation without filing a tariff, 49 U.S.C. § 317(d), and obliges such carriers to charge their published rates "for transportation or for any service in connection therewith". 49 U.S.C. § 317(b). Relying on these provisions, appellant Locust Cartage Co., Inc. brought suit in a Massachusetts state court against appellee Transamerican Freight Lines, Inc., seeking to recover the difference between Locust's published rates and the rates it charged Transamerican over a two year period. Transamerican immediately removed to federal district court on the grounds of diversity. After a tortuous procedural history, which consumed four years and included both informal and formal opinions from the Interstate Commerce Commission, the case is here on appeal from a final judgment against Locust.

Both parties are common carriers by motor vehicle operating under certificates of convenience and necessity issued by the I.C.C.[1] Their dispute stems from a contract which Transamerican entered with one Paul C. Ryan in 1961. At that time, Transamerican, a carrier with extensive interstate operations, was experiencing difficulty in the operations of its Boston terminal. Ryan agreed to take over dock handling at the terminal and to perform pick up and delivery service between the terminal and other points in Massachusetts, both within and without the Boston commercial zone as defined in 49 C.F.R. § 1048.9. Under the terms of the contract, Transamerican issued all shipping documents and dealt with the public, while Ryan employed the drivers and controlled the physical details of the service. Since Ryan possessed neither state nor federal operating authority, he purported to lease his equipment to Transamerican, which obtained appropriate licenses for the vehicles in its own name.

---

1. Locust is authorized to transport general commodities within Massachusetts under a certificate issued by the Massachusetts Department of Public Utilities and registered with the I.C.C. pursuant to 49 U.S.C. § 306(a)(1). Transamerican transports general commodities between points in a number of states under an I.C.C. certificate, and also possesses irregular route authority from the Massachusetts DPU.

Operations continued under this arrangement until February 1962, when Ryan purchased the stock of All Mass. Services, Inc., a common carrier authorized to provide service within Massachusetts. After changing the corporate name to Locust Cartage Co., Inc., Ryan caused the company to obtain new licenses for his vehicles and to file a notice with the I.C.C. adopting the tariffs of All Mass. Services. However, in spite of these indications that Locust intended to operate as a common carrier, Locust continued to perform pick up and delivery service for Transamerican and to charge Transamerican a rate other than the applicable tariff until late 1963, when I.C.C. investigators informed Locust that this practice was illegal. After extensive negotiations among Locust, Transamerican, and representatives of the Commission, Locust rectified its error by filing a concurrence in Transamerican's tariffs, effective as of October 1964.[2] Shortly thereafter, Locust filed suit to recover the difference between its tariffs and the rate it charged Transamerican from its date of birth in February 1962 to the date of its concurrence in October 1964.

In the district court, argument focused primarily on whether Locust's tariffs applied to the services which it performed for Transamerican. This issue, in turn, depended on whether the services in question were "transportation" within the meaning of 49 U.S.C. § 317(b) or a mere cartage operation. The district court initially directed the parties to seek an advisory opinion from the I.C.C. concerning whether Locust's published rates applied on the basis of several assumptions, the most important of which was that Transamerican did not exercise complete control over Locust's operations.[3] When an informal opinion of the I.C.C. staff upheld Locust's claim, Transamerican moved to stay proceedings on the grounds that the issue of the applicable rate fell within the primary jurisdiction of the I.C.C. The district court then ordered Transamerican to initiate proceedings for a declaratory order before the Commission. Both parties submitted arguments and extensive affidavits to the Commission. On the basis of these affidavits, the I.C.C. trial examiner concluded that Locust's operations exhibited the characteristics of a common carrier rather than those of a mere cartage operator, and that Locust was therefore bound to charge its published rate for services outside the commercial zone of Boston.[4] Division 2 of the Commission affirmed. 335 I.C.C. 46 (1969). However, the dis-

---

2. 49 U.S.C. § 316(c) permits carriers to establish joint rates. This is usually accomplished by having one carrier concur in the rates of the other pursuant to 49 C.F.R. § 1307.47.

3. The court order read, in relevant part:
   "Both parties will seek to secure an informal or, if possible, a formal ruling from the ICC as to whether in its opinion the agency tariffs of New England Motor Rate Bureau, Inc. would apply to the carriage of Locust Cartage Company, Inc. upon the following assumptions:
   "The first assumption is that there was an oral agreement or a novation of a written agreement under which Locust Cartage Company, Inc. agreed to carry for Transamerican Freight Lines, Inc. goods which were covered by shipping contracts between Transamerican Freight Lines, Inc. and its customers.
   "The second assumption is that the actual carriage was within the points that

Transamerican Freight Lines, Inc. was authorized by the ICC to carry goods.
   "The third assumption is that the shipper paid to Transamerican Freight Lines, Inc. precisely the amount that was appropriate if the total carriage was by Transamerican Freight Lines, Inc.
   "The fourth assumption is that Transamerican Freight Lines, Inc. did not have complete control of the operations of Locust Cartage Company, Inc. With respect to the fourth assumption, a more detailed statement may be made by the parties."

4. 49 U.S.C. § 302(c) (2) provides that the provisions of the Motor Carrier Act shall not apply to pick up and delivery service performed for a common carrier within a terminal area—here the commercial zone of Boston. *See also* 49 C.F.R. § 1057.3 (c) exempting operations within a commercial zone from the I.C.C.'s lease regulations.

trict court, relying on substantially the same evidence, concluded that Ryan and Transamerican intended no more than a cartage operation, and that subsequent developments did not alter their basic arrangement. The court therefore entered judgment against Locust.

## I.

An initial question we must confront is whether the district court properly substituted its own findings of fact and conclusions of law for those of the I.C.C. This question, in our view, turns on two separate issues: first, whether the issue of Locust's duty to charge its published rates fell within the special competence of the I.C.C.; and second, whether the I.C.C. has exercised its competence by drawing independent findings and conclusions from the record before it.

■ Turning to the first issue, we note that although Transamerican invoked the primary jurisdiction of the Commission in the court below, neither party has pressed the question on appeal. The doctrine of primary jurisdiction, however, does more than prescribe the timetable of a lawsuit; it also allocates the law-making function between court and agency. United States v. Western Pacific R. R. Co., 352 U.S. 59, 65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The doctrine is, moreover, especially relevant in cases like this, where courts are confronted with issues of fact arising under a complex regulatory scheme outside their normal experience. Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). We have, therefore, on our own motion considered whether the question of Locust's obligation to charge its published rate fell within the primary jurisdiction of the I.C.C. This, in turn, depends on "whether the question raises issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by that Act." United States v. Western Pacific R. R. Co., 352 U.S. at 65, 77 S.Ct. at 166.

■ Applying this standard, it is apparent that the question of Locust's obligation raises significant issues of transportation policy. Under 49 U.S.C. § 317(b), Locust's obligation to charge its published rates depends on whether Locust is performing "transportation * * * or any service in connection therewith." The term "transportation" plays a key role in the regulatory scheme created by the Motor Carrier Act. The Act defines this term comprehensively to include "all vehicles operated by, for, or in the interest of any motor carrier * * * together with all facilities and property operated or controlled by any such carrier * * * and used in the transportation of passengers or property in interstate commerce * * *." 49 U.S.C. § 303(a) (19). Those who provide transportation for hire must possess either a certificate or a permit issued by the I.C.C. 49 U.S.C. § 303(c). Possession of operating authority requires a carrier to observe a variety of statutory obligations, including the obligation to charge published rates, whenever it performs any form of transportation. See 49 U.S.C. §§ 316, 317, 318. These provisions do not prevent one carrier from placing his equipment under the control of another under a lease or similar arrangement. In such cases, the user rather than the owner provides transportation within the meaning of the Act, Cecil G. Dixon, 21 M.C.C. 617 (1940), and the statute is enforced by treating the user as the operator of the equipment in question. See, e. g., 49 C.F.R. § 1057 (I.C.C. regulations on lease and interchange of equipment). Thus the question of whether a carrier performs transportation has important consequences not only for the carrier itself, but also for the agency charged with enforcing the Act.

■ There is, however, no single touchstone for resolving this question. One important factor is whether a carrier has held himself out as performing an integrated transportation service. But it is common for traffic solicited and billed by one carrier to move over

the lines of another under an interline arrangement, and it is settled that one common carrier can act as an agent for another without losing his status as carrier. United States v. Brooklyn Eastern District Terminal, 249 U.S. 296, 39 S.Ct. 283, 63 L.Ed. 613 (1919). Another significant factor is whether a carrier retains sufficient control over an operation to discharge a carrier's responsibilities to shippers and the general public, but this question requires a weighing of several considerations, including whether the carrier assumes responsibility for the safety of equipment and control of daily operations. *See* Boston & Maine Transportation Co., 34 M.C.C. 599, 610–613 (1942). These factors illustrate that whether a carrier performs transportation cannot be determined by a simple verbal formula, but requires consideration of a complex of facts in the light of the broad remedial purposes of the Act. *Compare* United States v. Drum, 368 U.S. 370, 375–376, 82 S.Ct. 408, 7 L.Ed.2d 360 (1962). Of course, courts could resolve these factual questions, but they could not provide the uniformity of resolution required by the regulatory scheme. We therefore conclude that the issue of whether Locust was obliged to charge its published rate under 49 U.S.C. § 317(b) fell within the primary jurisdiction of the I.C.C. *Cf.* Agricultural Transportation Assoc. of Texas v. King, 349 F.2d 873, 883–885 (5th Cir. 1965).[5]

This conclusion brings us to the second part of our problem: whether the

I.C.C. in fact exercised the lawmaking powers reflected in the doctrine of primary jurisdiction. Since the Commission followed its normal procedure in a declaratory action, the answer would seem to be obvious. Transamerican, however, argues that the court, the parties, and the Commission itself contemplated that the Commission would merely offer an "advisory opinion" based on hypothetical circumstances posed by the court. Our examination of the record leads us to a contrary conclusion.

The issue of primary jurisdiction was first raised by Transamerican in October 1967, shortly before the case was scheduled for trial. We do not know why the district court failed to rule on the issue before requiring the delay and expense of a formal administrative proceeding. Nevertheless, the court's initial action in retaining jurisdiction and ordering Transamerican to seek a declaratory order were consistent with a formal reference to the I.C.C. under the doctrine of primary jurisdiction. *See,* Elgin, Joliet & Eastern Rwy. Co. v. Benjamin Harris & Co., 245 F.Supp. 467, 469 (N.D.Ill.1965); 3 K. Davis, Administrative Law Treatise § 19.07, at 42. The initial actions of the parties in submitting extensive affidavits to the Commission are also consistent with a formal reference to the agency. Moreover, the trial examiner obviously relied on these affidavits in reaching his ultimate conclusion concerning the applicable tariff. Two of the examiner's three ultimate findings cannot be deduced from

---

5. By this ruling we do not intend to encumber every carrier's suit for undercharges with a parallel administrative proceeding. The doctrine of primary jurisdiction is a flexible tool for the allocation of business between court and agency and should seldom be invoked unless a factual question requires both expert consideration and uniformity of resolution. Thus no reference to the agency is necessary when the issue turns on questions of law which have not been committed to agency discretion, *e. g.,* Packard Motor Car Co. v. NLRB, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), or when agency policy has already been clearly enunciated, *e. g.,* Shew

v. Southland Corp., 370 F.2d 376, 379–380 (5th Cir. 1966), or when the issue turns on questions of fact which are peculiar to the case and have no broader implications for the I.C.C.'s regulatory program. *E. g.,* Pennsylvania R.R. Co. v. Fox & London, 93 F.2d 669 (2d Cir. 1938). In this case, however, the question of whether Locust performed transportation raises broader issues of transportation policy requiring uniform agency resolution. Otherwise, Transamerican's identical relationships with two carriers in different terminal areas could produce diametrically opposed rulings on the appropriate tariff.

the court's assumptions alone, and the third, concerning Transamerican's lack of control over Locust's operations, reflects the examiner's independent study of the evidence, as well as the court's assumptions.

▮▮ At this point, however, an ambiguity appears in the record. In its exceptions to the examiner's report, Transamerican protested that the examiner erred in "[t]reating the issues as confined by the assumptions of fact set forth in the Court's order * * *." Answering this objection, Division 2 of the Commission stated:

"The function of this Commission in this proceeding is to render administrative aid to the court. Therefore, the examiner was correct in confining his consideration of the issues to those reflecting the court's assumptions." 335 I.C.C. at 50.

Both Transamerican and the district court read this statement to mean that the Commission made no independent findings, but relied entirely on the court's assumptions. But the statement can also be read as an accurate description of the limited administrative role in cases which raise both broad issues of regulatory policy and specific questions of contractual liability. *See, e. g.,* Thompson, Trustee v. Texas Mexican Railway System, 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946). The latter reading seems preferable. We doubt whether the Commission would have decided a significant issue of transportation law—and published its opinion—on the basis of a purely hypothetical situation. More probably, the Commission confined itself to the issues posed by the court's assumptions, but relied on the trial examiner's findings of fact. We conclude, therefore, that the Commission's declaratory order was not merely advisory, but reflected the Commission's considered opinion of an issue within its primary jurisdiction.

▮▮ Given this premise, we think the district court erred in substituting its own findings and conclusions for those of the Commission. When the Commission resolves a question within its primary jurisdiction, its resolution should not be set aside unless it exceeds the Commission's statutory authority or is unsupported by substantial evidence. Illinois Central R. R. v. Norfolk & Western Ry., 385 U.S. 57, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); Consolo v. Federal Maritime Commission, 383 U.S. 607, 619–621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); Keller Industries v. United States, 311 F.Supp. 384, 387 (N.D.Fla. 1970). Moreover, when a district court refers an issue to the I.C.C., a party aggrieved by the I.C.C.'s order must file an action for review within 90 days. 28 U.S.C. § 1336(c); *cf.* McLean Trucking v. United States, 387 F.2d 657, 659–660, 181 Ct.Cl. 170 (1967). No such action was filed in this case within the time allotted. Thus the decision of the I.C.C. on the issue of Locust's obligation to charge its published rates became final and binding on the district court. Elgin, Joliet & Eastern Rwy. v. Benjamin Harris & Co., 245 F.Supp. at 471–472.

## II.

We recognize that our conclusion concerning the binding effect of the I.C.C.'s order may seem harsh. Transamerican's failure to seek review may be attributed to honest confusion arising from ambiguities in the Commission's opinion. Were we convinced that the Commission's opinion was an insufficient basis for liability, we might remand for further proceedings before the I.C.C. On the other hand, this lawsuit has already been prolonged by several years because of Transamerican's insistence on obtaining the I.C.C. order whose consequences it now seeks to escape. Moreover, our own examination of the record convinces us that there was warrant in the law and a rational basis for the Commission's decision.

▮▮ The evidence before the Commission, while conflicting, supports its conclusion that Locust's operations exhibited the independence characteristic of a carrier performing transporta-

tion services. Transamerican emphasizes that all the shipments in question travelled on Transamerican's bills of lading, that Transamerican did all billing and collecting, and that Transamerican satisfied all damage claims. Moreover, the parties have stipulated that the rates charged shippers were based on Transamerican's tariffs from point of origin to point of destination, with no separate charge stated for the portion of the service performed by Locust. However, the I.C.C. hearing examiner found that Locust controlled the handling and routing of all shipments between the Boston terminal and points within Massachusetts. In addition, all drivers were employed by Locust, and Locust performed the required safety inspections of all equipment used in its portion of the service, including Transamerican trailers. Locust also carried its own meager business on the same trucks as Transamerican's freight. Finally, as the hearing examiner emphasized, the lease of Ryan's equipment to Transamerican was terminated as soon as Locust received operating authority from the I. C.C. Transamerican challenges this final conclusion, but it seems clear to us that the lease was primarily a device for putting Ryan's equipment on the road and had no further effect between the parties as soon as Locust obtained its own authority. These findings justify the I.C.C.'s conclusion that Locust did not transfer the exclusive use of its vehicles to Transamerican, but continued to exercise the kind of control characteristic of a motor carrier exercising its own authority. *See* Boston & Maine Transportation Co., *supra* at 611–613.

Transamerican attacks this conclusion as based on an erroneous legal standard. The correct criterion, in Transamerican's view, is not whether it lacked physical control of Locust's operations, but whether Locust's operations were part of a single complete freight service which Transamerican held out to the public. For this proposition Transamerican cites United States v. N. E. Rosenblum Truck Lines, Inc., 315 U.S. 50, 62

S.Ct. 445, 86 L.Ed. 671 (1942) and Thomson, Trustee v. United States, 321 U.S. 19, 64 S.Ct. 392, 88 L.Ed. 513 (1943). Both *Thomson* and *Rosenblum* involved applications for "grandfather" operating rights by carriers who had relied on independent contractors to provide their services. In each case, the I. C.C. awarded operating rights to the independent contractors rather than to the carrier who offered the service to the public. The Supreme Court rejected these rulings on the grounds that Congress, in providing for grandfather rights, did not intend to create multiple operating rights on the basis of a single integrated transportation service. United States v. N. E. Rosenblum Truck Lines, *supra* at 315 U.S. 53, 54, 62 S.Ct. 445; Thomson v. United States, *supra*, 321 U.S. at 24, 64 S.Ct. 392.

■ These cases do not, however, involve a total repudiation of the I.C.C.'s "control and responsibility" test. See Thomson v. United States, *supra* at 26, 64 S.Ct. 392. We agree with the Commission that control over daily operations is still a relevant factor in determining whether a truck owner performs transportation services. *See* Riss & Co., Inc., 48 M.C.C. 327, 353–360 (1948). We think the "control and responsibility" test may properly be made determinative when the issue is not which of several carriers is entitled to operating rights, but whether a carrier who has already secured such rights must abide by his statutory obligation to charge rates fixed by his tariffs. If *Rosenblum* and *Thomson* could be used to cloak the operations of two already certified carriers, then many of the I.C.C.'s detailed regulations of tariffs, joint rates, and leasing arrangements could be defeated by private agreement. We conclude, therefore, that the Commission was within its statutory authority.

### III.

■ There remains for consideration Transamerican's claim that even if Locust was a common carrier, it should be estopped from recovering more than

its agreed charge from another carrier. Transamerican concedes, as it must, that a carrier can recover undercharges from a shipper regardless of contrary agreement, misquotation by the carrier, reliance, or other equitable defense. Louisville & Nashville R. R. Co. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915); Pittsburgh, Cincinnati, Chicago & St. Louis Rwy. Co. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919). But Transamerican insists on the distinction between carriers and shippers. When a carrier charges a shipper less than its published rate, it confers an immediate economic advantage over other shippers similarly situated. Thus carriers cannot be permitted to vary their tariffs by agreement with individual shippers. Carriers are, however, encouraged to agree among themselves about joint rates. 49 U.S.C. § 316(c). Indeed, the agreed rate in this case would have been legal had Locust simply filed a concurrence. In these circumstances, Transamerican maintains, Locust should be estopped from recovering more than its agreed charge.

A similar argument was made and rejected in Bowser & Campbell v. Knox Glass, Inc., 390 F.2d 193 (3d Cir.), cert. denied, 392 U.S. 907, 88 S.Ct. 2061, 20 L.Ed.2d 1365 (1968), a case involving the efforts of a contract carrier to recover undercharges from a shipper. Contract carriers, unlike common carriers, are free to negotiate their rates with individual shippers so long as the resulting tariffs are filed. The carrier in *Bowser & Campbell* neglected to file an agreed rate which was substantially below its published rates. The court admitted that this oversight caused no harmful discrimination among shippers, but nevertheless permitted the carrier to recover. The duty to abide by published tariffs, in the court's view, served to discourage not only unjust discrimination against shippers, but also destructive competition among carriers, 390 F.2d at 195–197.

We find this reasoning compelling and applicable to our case. Published tariffs play a central role in expedit-

ing the I.C.C.'s rate regulation and in insuring the economic stability of the trucking industry. Even though joint rates are the product of bargaining between carriers, the obligation to publish and abide by these rates prevents the kind of fluid, ad hoc ratemaking which endangers efficient service. *Cf.* American Trucking Association v. United States, 344 U.S. 298, 305–306, 73 S.Ct. 307, 97 L.Ed. 337 (1953). Moreover, once carriers have agreed to file a joint rate, the Commission has the power to supervise their relationship and to establish a just division of fares between them. 49 U.S.C. § 316(f). Finally, published tariffs serve an important notice function for the Commission and other interested parties, *compare, e. g.,* Great Western Packers Express, Inc. v. United States, 246 F.Supp. 151 (D.Colo. 1965), a function which would be seriously jeopardized if carriers could readily enforce unpublished rates among themselves. It is for these reasons, we think, that the statute obliges carriers to collect their published tariffs from all who use their services, not merely from shippers. 49 U.S.C. § 317(b); *see* ICC v. North Pier Terminal Co., 164 F.2d 640 (7th Cir. 1947), cert. denied, 334 U.S. 815, 68 S.Ct. 1071, 92 L.Ed. 1746 (1948). This obligation is best enforced by treating one carrier as legally obliged to collect and the other to pay the published tariffs regardless of contrary agreement. *Cf.* Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520, 521, 59 S.Ct. 612, 83 L.Ed. 953 (1939); Baldwin v. Scott County Milling Co., 307 U.S. 478, 484, 485, 59 S.Ct. 943, 83 L.Ed. 1409 (1939).

We therefore hold that Locust was legally obliged to collect its published rates for services performed outside the terminal zone of Boston between February 1962 and October 1964, and that it is not estopped from collecting its full rate because of its agreement with Transamerican to accept a lesser sum. We express no opinion on the issue of damages.

Reversed and remanded for proceedings not inconsistent with this opinion.