LAS CRUCES TV CABLE, Teleprompter Corporation, UA–Columbia Cablevision, Inc. and United Cable Television Corp., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Television Relay, Inc., Spanish International Communications Corp., Cablecom-General, Inc., Intervenors.

LAS CRUCES TV CABLE et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Television Relay, Inc., Intervenor.

LAS CRUCES TV CABLE et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.

LAS CRUCES TV CABLE, Teleprompter Corporation, UA–Columbia Cablevision, Inc. and United Cable Television Corporation, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Television Relay, Inc., Intervenor.

Nos. 77–1915, 79–1133, 79–1134 and 79–2247.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1980.

Decided Feb. 23, 1981.

Joseph R. Reifer, Washington, D. C., with whom John P. Cole, Jr. and Daniel Stark, Washington, D. C., were on the brief, for petitioners.

Jane E. Mago, Counsel, F. C. C., Washington, D. C., with whom Sanford M. Litvack, Asst. Gen. Counsel, Dept. of Justice, Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., John J. Powers, III and James Laskey, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

Julian R. Rush, Keith H. Fagan and Roberta L. Cook, Counsel, F. C. C., and Barry Grossman and Andrea Limmer, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondents.

Richard H. Strodel, Peoria, Ill., with whom Richard H. Streeter, Washington, D. C., were on the brief, for Intervenor, American Television Relay, Inc. in Nos. 77–1915, 79–1133 and 79–2247 only.

James A. McKenna, Jr. and Norman P. Leventhal, Washington, D. C., entered appearances for Intervenor, Spanish International Communications Corp. in No. 77–1915 only.

Thomas G. Shack, Jr. and Robert M. Foley, Baldwin, N. Y., entered appearances for Intervenor, Cablecom-General, Inc. in No. 77–1915 only.

Before McGOWAN, Chief Judge, and WRIGHT and MacKINNON, Circuit Judges.

Opinion for the court filed by Chief Judge McGOWAN.

McGOWAN, Chief Judge:

These petitions for direct review of four Federal Communications Commission orders were filed by customers of American Television Relay, Inc. (ATR),[1] a microwave common carrier.[2] Petitioners challenge four as-

---

1. All four petitions for review in this case, Nos. 77–1915, 79–1133, 79–1134, and 79–2247, were brought by four cable companies who were customers of ATR during the period for which refunds are sought: Las Cruces TV Cable, Teleprompter Corp., UA-Columbia Cablevision, Inc., and United Cable Television Corp., and were consolidated for decision. Teleprompter operates, among others, the cable franchise in El Paso, Texas referred to below. American

Television Relay, Inc., 71 F.C.C.2d 130, 136 (1979).

2. The orders at issue in this case are all captioned *American Television Relay, Inc.* and were published at, in chronological order, 63 F.C.C.2d 911 (1977) (discussing lawfulness of ATR's 1973 rate filing) [hereinafter referred to as *ATR I*]; 65 F.C.C.2d 792 (1977) (same on reconsideration) [hereinafter referred to as *ATR I Recon.*]; 67 F.C.C.2d 703 (1978) (decid-

pects of the FCC's exercise of its discretionary power to award refunds, pursuant to 47 U.S.C. § 204, in directing ATR to return to its customers some of the monies it collected under rates found by the Commission to be other than just and reasonable: (1) the use of a 12.9% rate of return figure as a refund floor, (2) the method of calculating ATR's revenue requirements based upon the 12.9% rate, (3) the failure to accept non-tariffed rates as a refund floor for two cable customers, and (4) the award of interest at a 6% rate. We find substantial evidence to support the FCC's conclusions on all issues but the calculations of ATR's expenses, which we remand to the Commission.

## I

American Television Relay, Inc. operates a 1,400-mile microwave transmission system for the relay of radio and television broadcasts that extended at its peak from Los Angeles to El Paso, Texas. The Commission has said that about 60% of the expenses of operating the ATR system can be allocated to ATR's Los Angeles independent television station service,[3] the rates for which were the basis of the dispute in the instant proceedings. This service entails the transmission by microwave of the variegated fare of four Los Angeles television stations without national network affiliation to local cable television companies throughout the Southwest for retransmission by those cable companies to the homes of their subscribers. ATR is a wholly-owned subsidiary of Western Tele-Communications, Inc., which performs all the operating and support services for ATR and is itself wholly owned by Tele-Communications, Inc. (TCI). *See Recommended Decision* at 389; Intervenor's Br. (Rule 8(c) certificate).

Until 1972, the rates ATR set for its service were arrived at by negotiation with individual cable systems and individually filed with the FCC. *Id.* at 402.[4] Thus, there was no uniform rate structure or criterion, such as cost, for the calculation of rates.[5] In that year, ATR filed with the

---

ing among alternative methods of refund calculation) [hereinafter referred to as *ATR Refund*]; 70 F.C.C.2d 1631 (1978) (same on reconsideration) [hereinafter referred to as *ATR Refund Recon.*]; 71 F.C.C.2d 130 (1979) (discussing ATR's refund implementation plan and objections thereto) [hereinafter referred to as *ATR Refund Proposal*]; FCC 79–598 (Oct. 4, 1979) (same on reconsideration) [hereinafter referred to as *ATR Refund Proposal Recon.*].

Exactly which Commission orders are before this court is a matter not wholly free from doubt. The four petitions for review consolidated in this case literally challenge only the three above-cited Commission opinions on reconsideration, as well as American Television Relay, Inc., 70 F.C.C.2d 1623 (1978) [hereinafter referred to as *ATR II Recon.*]. We believe that the three initial orders *ATR I, ATR Refund,* and *ATR Refund Proposal* are properly before this court, because (1) they cover virtually the same issues as the opinions on reconsideration, (2) the parties refer to both sets of orders in their briefs, and (3) the petitioners could not have intended their challenge, if successful, to result only in the setting aside of the orders on reconsideration, with the initial orders remaining in full force.

A further question concerns the petition for review in No. 79–1133, in which the customers challenge the validity of *ATR II Recon.*, and, by implication, its predecessor, American Television Relay, Inc., 67 F.C.C.2d 527 (1978) [herein-

after referred to as *ATR II*]. These FCC orders relate solely to the issues presented by ATR's 1978 tariff filing which superseded the 1973–77 tariff at issue in the other petitions for review. The FCC has yet to decide upon the lawfulness *vel non* of this tariff. The customers, in their brief, do not raise any objection to the validity of those orders, and the questions they state are at issue in the case, *see* Petitioners' Br. at vii, do not involve the two agency decisions on the 1978 tariff. For these reasons, we believe that any challenge in the instant case to *ATR II* or *ATR II Recon.* is not now ripe for review.

3. American Television Relay, Inc., 65 F.C.C.2d 387, 391 (1977) (recommended decision of the chief of the Common Carrier Bureau) [hereinafter referred to as *Recommended Decision*].

4. Two cable systems, El Paso and Las Cruces, had been explicitly placed on a population-sensitive rate structure in 1972, one year before the rest of ATR's customers. *See* Part IV, B *infra.*

5. According to the chief of the Common Carrier Bureau, before 1972 "ATR had no rate structure *per se*; rather rates were arrived at through separate negotiations with each customer." *Recommended Decision* at 402 (footnote omitted). There is nothing in the record to indicate whether the negotiated rates varied

FCC a new rate structure of general applicability that would have substantially increased its revenues and rate of return. *ATR I* at 911; *American Television Relay, Inc.*, 37 F.C.C.2d 751 (1972) (designation order). Following a suspension, and subject to refund or eventual invalidation by the Commission, 47 U.S.C. § 204, the proposed rates took effect on January 11, 1973, *ATR I* at 912. The rate structure proposed by ATR made the rates charged to cable systems dependent on the distance of the customer from Los Angeles and the population in the customer's cable franchise area. This latter feature caused the proposed rate structure to be termed population-sensitive.

After hearings, the chief of the FCC's Common Carrier Bureau issued a recommended decision which upheld the population-sensitive aspect of ATR's proposed rate structure, but questioned its apportionment of customers into particular geographic zones, disputed some of ATR's rate base determinations, and concluded that ATR was entitled to a rate of return of between 12.9% and 14.5%, although the company had filed for rates that would have provided a 17.7% rate of return by 1975. *Recommended Decision* at 401–04, 410–11; *American Television Relay, Inc.*, 37 F.C.C.2d 751 (1972).

The final decision of the Federal Communications Commission, however, held that ATR had not carried its burden of proof to establish that its population-sensitive rates were just and reasonable. *ATR I* at 927–29. The FCC, noting that common carriers were usually required to establish a rate structure based solely on costs, held that ATR had not shown compelling reasons to establish population-sensitive rates. These rates were based, in part, on the value of the service to the cable company, which varied with the size of its potential audience for the Los Angeles service. *Id.* at 932. In addition, the Commission stated

that if refunds were ordered, ATR would be required to pay interest at a rate of 6% on any monies refunded. *Id.* at 932. The Commission adopted that figure by referring to the 6% interest rate American Telephone and Telegraph Co. proposed to pay on customer deposits. *Id.* None of these determinations was modified upon reconsideration. *ATR I Recon.* at 795–96, 801.

Complying with the FCC's order to file a revised tariff, *ATR I* at 933, the carrier proposed new rates which did not vary charges by population. *ATR II* at 527. The Commission, declining to suspend the new tariff, nevertheless refused to hold it lawful [6] and set it for a hearing. The Commission, by the time this case was argued on October 31, 1980, had not yet arrived at any final determination with respect to ATR's 1978 tariff. *See* note 2 *supra.*

Although it had not yet completed its inquiry into these newly-filed rates, the Commission went ahead with its effort to determine an appropriate level of refunds for the 1973–77 period, when ATR's customers were paying population-sensitive rates that the FCC had found to be not just and reasonable. The Commission, in *ATR Refund* at 705, mentioned several equitable factors which it thought relevant to its refund decision: (1) the desirability of an early payment to customers who had been charged unlawful rates for four years, (2) the uncertain financial condition of ATR, and (3) the unlikelihood of establishing a lawful rate structure for ATR in the near future.

The Commission found itself confronted with five distinct methods of refund calculation. The first method, which would have resulted in the largest refunds, simply involved returning to each customer its share of the $1 million the customer paid in ex-

---

with population, although the pre-1973 rates bore "some relationship to ... distrance." *Id. See* note 19 *infra.*

**6.** In the argot of ratemaking, a "legal" rate is one filed by the regulated firm with the regulatory agency and not held by that agency to be

invalid. A "lawful" rate is a legal rate that the regulatory agency has upheld as valid. *See Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway Co.*, 284 U.S. 370, 383–86, 52 S.Ct. 183, 184–85, 76 L.Ed. 348 (1932).

cess of its 1972 rates.[7] A second method would have required the Commission to calculate for each customer a lawful rate for the years 1973–77 and order ATR to refund all monies collected in excess of those rates. A third method would have set the refund floor for each customer, above which all monies collected would be returned, at the 1978 rates proposed by ATR. A fourth method, which was chosen by the Commission, ordered ATR to place into a refund pool the total amount collected by ATR in excess of what it would have been entitled to under a 12.9% rate of return. This pool would in turn be distributed to each individual customer according to the ratio of the customer's increase in rates over their 1972 level [8] to the entire amount of the contemporary increase collected from all cable systems. Thus, this method attempted to some extent to undo the effects of the population-sensitive tariff because the cable systems serving the most populous areas, with the exception of El Paso and Las Cruces, suffered the greatest rate increases between 1972 and 1973. The final method would have awarded interim refunds immediately under the formula adopted by the Commission, and distributed further refunds, if any, based upon whatever rates were eventually found lawful for 1978.[9]

The Commission considered all five methods on the basis of the equitable considerations mentioned above, and rejected the four alternatives to its choice. Awarding refunds totalling over $1 million on the basis of pre-1973 rates would, the Commission thought, impose an intolerable financial burden on the carrier, *ATR Refund Recon.* at 1634, and would cause ATR's rate of return to fall well below the 12.9% level found just and reasonable, *ATR Refund* at 707. Establishing lawful rates for the

years 1973–77 would have required a significant expenditure of FCC effort to determine rates solely of retrospective value without, in the FCC's judgment, enough improvement in the refund formula to warrant the exercise. *ATR Refund Recon.* at 1633–34. Use of the 1978 filed rates as a floor for immediate refunds, or eventual use of 1978 lawful rates combined with interim refunds, were both rejected on the grounds that the customers had failed to show that the 1978 rates would provide a more suitable basis for refund calculation than would application of the 12.9% figure. *ATR Refund* at 709.

Having settled upon its refund-pool plan, the Commission next invited ATR to submit a plan for the disbursement of the pool to the customers, who raised the three objections to ATR's proposal now before this court. The customers complained first that ATR's recalculation of its revenue requirements for the 1973–77 period did not truly result in limiting their rate of return to 12.9%. Under the ATR plan adopted by the Commission, the refund pool would total $248,872, a figure arrived at by reducing ATR's bottom-line net profit to the point where it was 12.9% of its adjusted rate base.[10] *See ATR Refund Proposal* at 131–32.

The customers attacked this method of calculation by arguing that, since the FCC had ordered decreases in ATR's rate of return and rate base, ATR's interest, tax, and administrative expenses should all be recalculated downward. *See ATR Refund Proposal* at 131. The customers argued that corporate income tax expense is a function of profit: the lower the profit, the less the tax liability. Further, they pointed out that on the ATR system, the general and

---

**7.** Those customers who began using ATR's service after 1972 were to receive refunds based on what they would have paid had they joined the ATR system before 1973. *See ATR Refund* at 708.

**8.** In the case of customers added after 1972, a hypothetical refund floor would be used. *See* note 7 *supra.*

**9.** *See ATR Refund* at 707–11; *ATR Refund Recon.* at 1633–34. *See also* Joint Appendix at 219–220 (Customers' Joint Petition for Partial Reconsideration [of *ATR Refund*]) [hereinafter referred to as J.A.].

**10.** The Commission had also required ATR to adjust its rate base downward. *See ATR Refund Proposal* at 132; note 17 and accompanying text *infra.*

administrative expenses incurred by ATR's parent are, with the approval of the FCC, allocated to it on the basis of revenues. *See Recommended Decision* at 391. Finally, they argued that because ATR's cost of debt was pegged at 10.4% of a fixed percentage of its rate base, *see id.* at 398, and because the Commission's *ATR I* decision had reduced ATR's allowable rate base by over $300,000, *see id.* at 397; *ATR I* at 918–21, ATR's interest expense should be correspondingly reduced. *See* J.A. at 318 (customers' revenue adjustment calculations); note 17 *infra.* The result of these changes would be to almost double the size of the refund pool to, including interest, $444,961. *ATR Refund Proposal* at 131.

The Commission declined either to accept the customers' figures, or adopt their reasoning as a basis for its own calculations. The FCC explained that, in calling for a refund pool based on excess profits, it never intended a "wholesale recalculation" of ATR's rate base. *Id.* at 132. On reconsideration, the Commission added that it "did not intend to rely on untested figures subsequently submitted in other filings to determine refund liability, as Petitioners advocate." *ATR Refund Proposal Recon.* at 2. Finally, the Commission argued that the customers' refund calculations should have been propounded when the Commission was choosing among refund schemes, rather than when it was deciding how to implement the refund pool plan. *Id.* at 3.

The two cable system franchise holders in Las Cruces, N.M. and El Paso, Texas contended that the refund pool formula was unfair to them, because it failed to take into account the fact that they were placed on the population-sensitive tariff in 1972. This meant that the increase they experienced from 1972 to 1973 was relatively smaller than other cable systems, and, therefore, their percentage of the refund pool had been correspondingly lessened. The customers had argued that the proper floor for calculating their increase from

1972 to later years was not the tariffed population-sensitive rate, but lower non-tariffed rates contained in contracts negotiated between ATR and the two cable systems. *ATR Refund Proposal* at 133. The Commission argued that to use non-tariffed rates to calculate refunds would be contrary to established ratemaking principles embodied in section 203 of the Communications Act. *Id.* at 133–34. On reconsideration, the Commission added that basing refunds on other than the 1972 rates would be unfair to the other customers, and that those customers joining ATR's system after 1973 were accorded special treatment because they, and they alone, had no 1972 rate on which to base refunds. *ATR Refund Proposal Recon.* at 4.

Finally, the customers questioned awarding interest on refunds at the rate of only 6%.[11] They said that these unlawfully-collected rates could be more aptly analogized to forced loans, and that therefore a figure akin to ATR's cost of debt, 10.4%, would be appropriate. The FCC, which adopted the figure from the rate that AT&T proposed to grant on customer deposits, refused to raise the interest rate to "match the constantly changing cost of money in the financial markets," *ATR Refund Recon.* at 1637.

## II

This is the first time the Federal Communications Commission has attempted to articulate standards governing its award of refunds to customers of a communications common carrier under section 204 of the Communications Act. *See* American Bar Association, Section of Public Utility Law Annual Report 215 (1978). But to ascertain the correct standard for judicial review of the refund decision in this case, we may turn to the standards that have guided this and other courts in their review of refund decisions made by other agencies in rate cases concerning the carriage of freight,

11. Interest was awarded on each payment made under the population-sensitive tariff for

the interval between that payment and the replacement of the tariff.

passengers, or natural gas.[12] Many statutes involving administrative rate setting, including the portions of the Communications Act relevant here, sections 203, 204 and 205, can trace their lineage to the prototypical ratemaking statute, the Interstate Commerce Act. S.Rep.No. 781, 73rd Cong., 2d Sess. at 4 (1934); H.R.Rep.No. 1850, 73rd Cong., 2d Sess. at 5–6 (1934). Those sections of the Communications Act are, in large part, identical to the analogous provisions of the Natural Gas Act. *Compare* 47 U.S.C. §§ 204, 205 *with* 15 U.S.C. §§ 717c, 717d (Natural Gas Act). Barring some showing of circumstances peculiar to the industry being regulated, the principles of judicial review of agency refund decisions in ratemaking cases are of general applicability.

Section 204 states that the Federal Communications Commission "may . . . require" refunds. While the permissive wording of the statute leaves refund decisions to the discretion of the Commission, it does not follow that the Commission is freed from the burden of adducing substantial evidence in support of this decision, or that a reviewing court is without warrant to conclude that a particular exercise of the Commission's discretionary refund authority is either well- or ill-founded. The Administrative Procedure Act itself contrasts agency discretion that disables a reviewing court from setting aside administrative findings, 5 U.S.C. § 701(a)(2), with the familiar review by an abuse-of-discretion standard, 5 U.S.C. § 706(2)(A).[13]

Courts reviewing agency refund decisions have shown great deference to the agency's wisdom in ordering refunds, a deference perhaps based upon the discretionary nature of their refund power, but have nevertheless looked closely to see if the agency had considered relevant factors and if it had struck a reasonable accommodation among them. In *FPC v. Tennessee Gas Co.*, 371 U.S. 145, 155, 83 S.Ct. 211, 216, 9 L.Ed.2d 199 (1962) (citation omitted), Justice Clark wrote that it was the "duty of the Commission to look at 'the backdrop of the practical consequences . . .'" in making refund determinations. In examining whether the old Federal Power Commission (now the Federal Energy Regulatory Commission) had performed its duty in proper fashion, however, the Court deferred to the Commission's conclusion that the value of immediate refunds outweighed the harm that might occur should the FPC later determine that Tennessee Gas had actually been entitled to some of the monies refunded. *See* 371 U.S. at 149–53, 83 S.Ct. at 213–15.

Later cases have emphasized both the Commission's duty to consider relevant factors, such as harm to consumers, and the wisdom of deferring to the balance struck by the agency between comparative benefits and losses, often termed "equitable considerations." *See, e. g., Public Service Commission v. FPC*, 329 F.2d 242, 250 (D.C. Cir.), *cert. denied*, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735 (1964). Recently, this court held that the standard of review of an agency refund order is whether the agency decision is "equitable in the circumstances of this litigation." *Wisconsin Electric Power Co. v. FERC*, 602 F.2d 452, 457 (D.C.Cir. 1979). This stress upon "equitable considerations," indicates that, while the agency has a duty to consider the relevant factors in making a refund decision and enjoys a broad discretion in weighing those factors, the precise manner in which these general

---

**12.** All parties to this case in their briefs, and the Commission in its decision now under review, cite cases involving other types of common carriers and urge their applicability to this case.

**13.** Our review here is premised upon the substantial-evidence, rather than the abuse-of-discretion, standard because the reference to a "hearing" in 47 U.S.C. § 204(a) requires the application in this undeniably adjudicatory context of 5 U.S.C. § 706(2)(E). *See United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 239–46, 93 S.Ct. 810, 818–21, 35 L.Ed.2d 223 (1973). In addition, the substantial evidence standard emphasizes the requirement that whatever facts the agency adduces in support of its decision must be found in the formal record compiled during the proceedings. *See Industrial Union Dept., AFL–CIO v. Hodgson*, 499 F.2d 467 (D.C.Cir.1974).

principles should be applied by a reviewing court depends upon, as is traditional in cases sounding in equity,[14] the facts of the particular case.

## III

■ The first issue presented in this case is the propriety of the FCC's use of a 12.9% rate of return as a suitable basis upon which to calculate refunds. Before considering any of the proposed alternatives, we should ascertain whether substantial evidence supports the FCC's conclusion that its plan was reasonable. We believe that the agency did marshal substantial evidence behind the 12.9% formula. The figure had been specifically selected by the Commission as one that would provide a just and reasonable return to ATR. Our attention has not been called to any evidence that would undercut this finding.

Having decided to return the incremental charges collected by ATR based on a rate of return in excess of that found just and reasonable, the agency then decided to distribute it according to the refund-pool plan outlined above. We think that this scheme was also reasonable. The plan gave the largest refunds to the customers who received the greatest rate increase between 1972 and subsequent years. Those were the customers who suffered most through imposition of the population-sensitive rate structure. Thus, the FCC's refund-pool scheme by and large awarded the largest refunds to the customers who had been most affected by the population-sensitive tariff. We cannot say that this represented a policy that the Commission was not free to adopt, nor that this was an unsound way of putting that policy into effect.

Even though we think that, considered apart from all the alternatives, the FCC's refund-pool plan was reasonable, we recognize that these alternatives were also placed upon the agency record. In applying the general considerations informing our review of refund decisions to the facts of this case, we believe that one factor bearing upon the reasonableness of the FCC's decision is the attractiveness of these alternate plans, and that the FCC's reasons for not adopting them deserve some scrutiny.

The Commission rejected basing refunds upon each customer's 1972 rates on the grounds that the size of the refunds thus calculated would impose an intolerable financial burden upon the carrier. Customers argue sedulously that the representations of ATR's parent company, TCI, to the Securities and Exchange Commission that any refund order would not harm TCI should have forced the FCC to discount any threat to ATR's financial health. The difficulty with their argument is that the proper consideration for the FCC is not the health of the parent company, but of the regulated subsidiary which is itself entitled to a fair rate of return. The customers are unable to cite any authority for the proposition that the financial status of a parent is in any way relevant to ratemaking determinations involving a subsidiary. Nor could they, because the agency's concern is the health of the regulated company, not whether its stockholders will be ruined by the loss. *See ATR Refund Recon.* at 1636 n.12. There is no evidence that TCI intends to operate the ATR system as an eleemosynary enterprise; presumably, it must operate profitably just like any other regulated firm. We cannot say that the FCC erred in disregarding the financial impact of any refund order on TCI, and in concentrating upon its effect on ATR.[15]

14. ... [T]he discretion [of an equity court] is not the mere personal discretion of the chancellor or judge, but is a judicial discretion, which means that the judge consults precedents to find the principles, as distinguished from strict rules, which are applicable to a given situation, and then determines, from all of the facts in the case, what relief will best give effect to the various principles involved.

H. McClintock, Handbook of the Principles of Equity 51–52 (1948).

15. Customers argue that the FCC misperceives the effects of a $1 million refund because it ignores the tax savings such a drop in income would engender. Petitioners' Reply Br. at 19 n.22. But the precise tax consequences of such a loss have not been brought before us, and even if ATR would enjoy tax benefits from

An even more serious flaw with the use of 1972 rates as a refund floor, was, as the Commission pointed out, that ATR, despite use of a population-sensitive tariff, was entitled to 12.9% as a just and reasonable rate of return. *See ATR Refund* at 707. The Commission's desire to see a regulated common carrier, whose pre-1973 rates were projected to provide a rate of return of only 4.7%, *American Television Relay, Inc.,* 37 F.C.C.2d 751 (1972), earn a fair rate of return is appropriate. *See Nader v. FCC,* 520 F.2d 182 (D.C.Cir.1975). ATR had set its pre-1973 rates this low to encourage development of its independent-station service. The customers were unable to explain why using such developmental rates as a refund floor was proper, other than that it would provide the greatest amount of refunds. Although we agree that this is certainly a relevant consideration, we also take heed of Judge Leventhal's analysis of refund decisions:

> While full refund under an invalid order is a sound basic rule, it may be offset, at least in part, by ... [inter alia] the fact that some portion of the increased prices paid may be discerned as consistent with just and reasonable ... rates.

*Consumer Federation of America v. FPC,* 515 F.2d 347, 359 (D.C.Cir.1975).

The Commission also rejected establishment of lawful rates for each of the years from 1973 to 1977 for use as refund floors, principally because it concluded that the improvement in the refund formula would be outweighed by the added time and expense entailed by formally establishing rates which would be wholly useless except as a basis for refunds. In asking us to overturn this FCC conclusion, the customers are in effect asking this court to set priorities for an administrative agency and to extend formal adjudicatory proceedings where the agency had thought that none were necessary. The courts are traditionally loath to interfere with the agency's procedural choices in this manner, *see, e. g., FCC v. Schreiber,* 381 U.S. 279, 290–91, 85

S.Ct. 1459, 1467–68, 14 L.Ed.2d 383 (1965); *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 143–45, 60 S.Ct. 437, 441–42, 84 L.Ed. 656 (1940). Furthermore, the Communications Act of 1934, § 4(j), 47 U.S.C. § 154(j), states explicitly that the FCC "may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice."

The Supreme Court, in the context of informal rulemaking, has recently warned against judicial insistence on more formal procedures than those chosen by the agency or required by the Administrative Procedure Act. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). While not dispositive of the issue here, *Vermont Yankee* serves to caution us against instructing the agency how to adjudicate a refund dispute without good reason. If, for example, the customers had adduced uncontroverted evidence implying that establishing lawful rates for the 1973–77 period was the only reasonable method of calculating refunds, we might be compelled to remand for such ratemaking. But, as we have pointed out above, our conclusion is that the path chosen by the FCC is a plausible one, and our only further responsibility is to ensure that the FCC did not unreasonably refuse to accept an alternative so obviously superior as to require a further substantial commitment of agency resources.

The other alternatives rejected by the FCC involve use of the 1978 rates. One alternative was to base refunds upon the 1978 filed rates; the other was to award interim refunds now on the basis of the refund-pool plan and make further refunds later under whatever rates were found by the FCC to be lawful for 1978. The FCC's decision not to use the filed rates was justified on two grounds. First, the agency noted that the rates had not been found to be lawful and thus there was no reason to think that they would provide a refund

---

taking the loss, the FCC could still reasonably concern itself with the impact such a refund might have. In any event, the FCC's desire to

see ATR earn a just and reasonable return provides independent support for their refusal to use 1972 rates as a refund floor.

floor superior to that of the 12.9% plan. Second, the Commission pointed out that the 1978 filed rates were not comparable to the 1973–77 rates. *ATR Refund Recon.* at 1633; *ATR Refund* at 709. The Commission observed that ATR's 1978 rate filing was based upon another novel rate structure of uncertain lawfulness, *see id.*

The Commission could well also be referring, in stating that the rate structures could not be compared, to the fact that ATR's 1978 filing was founded upon a customer based substantially larger than that of 1973, because ATR was continually adding customers from 1973 to 1978. *See ATR Refund Recon.* at 1633 n.3.[16] Thus, the 1978 rates were based upon ATR's costs allocated among more customers than the 1978 rates; if there are any economies of scale on the ATR system, the customers in 1978 would each be responsible for less of ATR's expenses. Thus, the 1978 rates might provide a lower floor than the figures arrived at under the refund-pool plan, and therefore higher refunds, but that would be due to the fact that, as the Commission pointed out, ATR's rate structure embodied in the 1978 filed rates was not comparable to the 1973 rate structure. The difficulty of any comparison between ATR's rate structure six years apart also supports the Commission's refusal to leave the door open to future refunds based upon whatever rates and rate structure the Commission would eventually find lawful.

With this in mind, we can see how the Commission might well come to the conclusion that use of either 1978 filed or future 1978 lawful rates would be unlikely to "more perfectly match the unlawful portion of the subject rate increase than that contemplated here." *ATR Refund* at 709. We do not find in the record any evidence demonstrating that use of the 1978 rates would lead to refunds that would better serve the Commission's twin goals of treating the customers fairly and preserving the financial integrity of ATR. The customers ar-

gue before this court that 1978 rates "represent [ ] the best available approximation to 'just and reasonable' rates ...," Petitioners' Br. at 43, but do not indicate where in the record the evidentiary support for that conclusion can be found. We note that at least one of the customers arguing for use of the 1978 rates has raised serious objections to those rates before the FCC. *See ATR II* at 531–33. Without any showing by the customers that use of the 1978 figures was in some way more appropriate than the Commission's own refund-pool plan, we believe that the Commission's decision to reject those figures in favor of its refund-pool plan was amply supported by the evidence of record.

## IV

Having determined that the FCC's choice of the refund-pool plan was a reasonable exercise of its discretionary power to award refunds, we can now turn to the three specific aspects of the plan's implementation that the customers seek to set aside. We are unable to say that the FCC's refusal to recalculate ATR's expenses in response to the customers' computations was bottomed on substantial evidentiary support, but we do conclude that its decisions regarding interest and the use of non-tariffed rates should be affirmed.

### A. Calculations of ATR's Expenses

■ Our problem with the Commission's refusal to recalculate ATR's interest, tax, and general and administrative expenses is that we are unable to trace the reasoning employed by the Commission in choosing a method which, according to the customers, provides ATR with a return far higher than the 12.9% found just and reasonable by the FCC. Since we cannot follow the Commission's train of reasoning, we are unable to perform our task of determining whether it is supported by substantial evidence.

The Commission advanced three reasons for its rejection of the customers' scheme.

16. In 1978, ATR had 29 customers, while in 1972, ATR had only 20 customers. J.A. 314–15.

It first said it had never intended a "wholesale recalculation" of ATR's rate base for the purpose of awarding refunds. *ATR Refund Proposal* at 132. But the recalculation of ATR's rate base upon which customers relied, at least for the interest-expense item, was that performed by ATR itself in response to the FCC's decision in *ATR I*. [17] Recalculation of the other two expense items, tax and general and administrative expenses, is unrelated to modifications in ATR's rate base. Accordingly, we cannot accept this explanation, at least as presented in *ATR Refund Proposal.*

The Commission also argued that the customers' figures were filed too late, in that they were submitted in response to ATR's refund proposal, rather than at the time the Commission was weighing various refund plans. Thus, the Commission would have us believe that this issue was decided by its statement in *ATR Refund* that ATR must predicate its refund calculations upon certain changes in its rate base and rate of return. *See ATR Refund* at 708. We think that this statement does not foreclose the possibility of further consideration of ATR's revenue requirements, especially those that vary with revenues or rate base. The Commission's statements in *ATR Refund* leave open the possibility of refunds calculated on either ATR's or the customers' formula, and we therefore conclude that the customers' computations were timely filed.

The Commission finally argued that it could not accept the customers' calculations because they involved "untested figures." *ATR Refund Proposal Recon.* at 2. Our initial difficulty lies in deciding to which figures the Commission was referring. The figures used by the customers in their computations, *see* J.A. at 317–25, appear to be either those supplied by ATR and relied upon by the Commission in approving ATR's excess return calculations, or numbers derived from mathematical manipula-

tion of ATR's figures. In any event, the Commission is not bound to accept the customers' computations, but confronted with them, we think that at least the Commission was obliged either to perform its own calculations or explain what was wrong with the customers'. There is nothing in any of the Commission opinions that undercuts the customers' argument that not recalculating ATR's expenses in response to changes in its rate base and revenues would provide ATR with a rate of return above the 12.9% figure found just and reasonable. Since we cannot understand why the Commission rejected this, we are forced to remand for, at the least, a more lucid presentation of the Commission's reasoning.

### B. Special Treatment for Las Cruces and El Paso

The customers in El Paso, Texas and Las Cruces, New Mexico argued that the proper refund floor for them, unlike all other customers who had subscribed to the ATR Los Angeles service before 1973, was not the 1972 tariffed rates, which in their case were population-sensitive, but the far lower rates that they claimed they had contracted with ATR to pay. *See* J.A. at 319. The FCC declined to adjust the refund floor on this basis, stating that it would require the use of nontariffed rates, contrary to the principles of sound ratemaking. *ATR Refund Proposal* at 133–34.

■ We think that, faced with the choice of using either a population-sensitive rate or a nontariffed rate as a refund floor, the FCC acted within its discretion in choosing the population-sensitive rate. The Commission refers to the policy against giving any credence to nontariffed rates or charges that appears in section 203 of the Communications Act of 1934. The congressional policy against rate discrimination through secret, nontariff arrangements is embodied in

---

**17.** ATR's refund-pool proposal had based profit calculations upon a rate base that had been reduced by $328,283, *see* J.A. at 313, following the FCC's finding that ATR had understated its reserve for depreciation, and thus overstated its assets upon which it was entitled to a re-

turn, by that figure. *Recommended Decision* at 396–97, 412; *ATR I* at 921. The FCC then ordered ATR to use this adjustment in calculating refunds. *ATR Refund* at 708; *ATR Refund Proposal* at 132.

that section, which in turn is modelled on section 6 of the Interstate Commerce Act. S.Rep.No. 781, 73rd Cong., 2d Sess. at 4 (1934).

For most of this century, courts have given effect to this statutory language and the underlying congressional policy by allowing a shipper to collect from a customer the full tariffed rate, even if carrier and customer, as is alleged here, agreed upon a lower rate. In *Louisville & Nashville Railroad Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915), Justice Hughes wrote that allowing the shipper to sue for the under collection was "undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination."

That policy interest against crediting non-tariff rates has been applied by courts to contract, as well as common carriers, see *Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334 (1st Cir.), cert. denied, 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1970); *Bowser & Campbell v. Knox Glass, Inc.*, 390 F.2d 193 (3d Cir.), cert. denied, 392 U.S. 907, 88 S.Ct. 2061, 20 L.Ed.2d 1365 (1968), and to maritime shipping, under the cognate provision of the Shipping Act, *Maritime Service Corp. v. Sweet Brokerage De Puerto Rico*, 537 F.2d 560 (1st Cir. 1976). We do not see how El Paso, in receiving refunds lessened by use of a population-sensitive tariff rather than a non-tariffed rate as a refund floor, is being treated more unfairly than a customer who pays a non-tariff rate in good faith and is then liable for a further charge based upon the filed rate.

■ Although the undercollection cases can be distinguished in that the rates in those cases were not being challenged, while the 1972 rate paid by Las Cruces and El Paso was,[18] it is indisputable that in all cases there had been a deviation from the published, legal rate. Until a filed rate is found unlawful by a regulatory agency, it is considered legal and must, unless suspended, be charged for all relevant carriage. *Louisville & Nashville Railroad Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). The policy interests against non-tariffed rates that found expression in judicial approval of undercollection actions against, for example, a railroad passenger paying a lower rate in good faith, similarly support the FCC's decision not to allow some cable television companies to receive a higher proportion of the refund pool monies, at the expense of ATR's other customers, through use of off-tariff rates, even though the alternative refund floor was a rate later found to be unreasonable.[19]

## C. Award of Interest at 6%

■ The Commission set the rate of interest on unpaid refunds at 6%, a figure that the customers complain is far too low. They float a number of alternatives, such as the 9% the Federal Energy Regulatory Commission uses in similar cases, or the 10.4% that the FCC allowed as ATR's cost of debt. What they do not do is demonstrate that the Commission's choice is unsupported by substantial evidence. The Commission borrowed the 6% figure from the interest rate AT&T proposed to pay on customer deposits and further argued that it represents what ATR might have earned

18. Following the submission of this case, the FCC's Common Carrier Bureau issued a decision holding that the 1972 rates charged to Las Cruces and El Paso were unreasonable and unlawful, essentially for the reasons listed by the Commission in *ATR I*. *See Cable Capital Corp. v. American Television Relay, Inc.*, FCC No. TS 1–74 at 12–13 (Jan. 7, 1981).

19. Customers argue that refusing to modify the refund floor for El Paso and Las Cruces would result in great injustice, because only they were placed under the population-sensitive tariff in

1972. But to make that case, they would have had to indicate where in the record one could find evidence indicating that the pre-1973 negotiated rates were wholly unrelated to the population of the franchise area and thus the willingness and ability of the cable operator to pay for ATR's service. It may be that the negotiated rates did vary somewhat with population and therefore that El Paso and Las Cruces were not treated in a manner dramatically different from that accorded ATR's other customers.

on the money had it been placed in a refund escrow account, *ATR Refund Recon.* at 1636–37.

The FCC's conclusion is not undercut by the existence of other reasonable figures, such as 9% or 10.4%. For this court to set aside the Commission's choice of one number out of an infinitude of possibilities we would have to be persuaded that looking at the entire record no reasonable case for the Commission's choice was made. But (1) the use by AT&T of the same figure in an analogous situation and (2) the likelihood that ATR would not have earned any more than 6% on that money had it been placed in an escrow account constitutes substantial support for the FCC's conclusion. Therefore, rejecting the 6% figure in favor of another reasonable number would be nothing more than substituting our judgment for the Commission's. This we are not empowered to do.

### V

Having affirmed the Commission on three of the four issues presented to us— use of the 12.9% figure as a refund floor, treatment of El Paso and Las Cruces, and the appropriate interest rate on refunds— we are, for the reasons set forth above, constrained to remand this case to the Federal Communications Commission for further consideration of the proper method of calculating ATR's total refund obligations based upon the rate of return and rate base that the Commission has found to be just and reasonable.

*It is so ordered.*